HARRY HEYN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5998–64. Filed June 9, 1966.

*Howard B. Crittenden, Jr.*, for the petitioner.
*Harry M. Asch*, for the respondent.

The Commissioner determined a $7,955.17 deficiency in petitioner's income tax for 1960. At issue is whether petitioner sustained a deductible casualty loss by reason of an earthslide, and if so in what amount.

FINDINGS OF FACT

The stipulated facts together with accompanying exhibits are incorporated herein by this reference.

Harry Heyn, a resident of Sausalito, Calif., filed his individual income tax return for the calendar year 1960 with the district director of internal revenue, San Francisco, Calif.

Prior to 1960, Heyn purchased a lot for $18,000 in Sausalito on the corner of Josephine Street and Atwood Avenue for use as a building site. He owned the property throughout 1960 and has continued to do so to the present time.

The property is roughly triangular in shape and is a hillside lot sloping in a southerly direction. It extends 92.42 feet along Atwood Avenue, its northern boundary, and 64.93 feet along Josephine Street, its southeastern boundary. The property at its lowest point on Josephine Street is approximately 30 feet lower than at its highest point on Atwood Avenue.

The building which was to be erected and which in fact was subsequently erected on the lot is a two-story structure, consisting of two apartments on the lower level which have been used for rental purposes and one apartment on the upper level which has been occupied by petitioner as his personal residence. There are also carports appurtenant to each level. Petitioner employed a licensed architect to draw the plans and specifications for the building. Also, licensed soils engineers as well as structural engineers were hired in connection with the contemplated construction.

Prior to any construction contract being entered into, the soils engineers inspected the property and rendered an opinion on the geologic and soil conditions as they would affect the support necessary for the building operation. They found that the basic geologic formation existing on petitioner's property was a massive fine-grained dense sandstone which was moderately to highly fractured. Moderately fractured sandstone is fairly unstable, and will not be stable in excavation cuts having a slope of 55 degrees. If water is present in such soil there is complete instability. They also found that the lot contained loose fill. Fill does not have good support or bearing capacity unless it is compact. Springs are common in the type of geologic formation found on this property. The architect and structural engineers as well as the parties involved with the proposed con-

struction were aware of evident indications that water might be present on the property. There is a visible spring across the street from the property and within 50 yards of it, which was active and in existence during the years 1959 and 1960. The structural engineers were concerned about the bearing capacity or stability of the soil and in particular feared that a spring would impair the stability of a large portion of the construction site and might cause a slide. Because of the above problems of the steepness of the hillside lot and the possible reaction of water on the soil formation found on the property, the soils engineers recommended that adequate protection be provided during excavation and construction to prevent movement of the surface soils.

Prior to entering into the construction contract hereinafter referred to Heyn twice solicited bids for the construction work to be performed on his property. The lowest bid in the first set received was in the amount of approximately $105,000. The range of the second set of bids was between $90,000 and $100,000, one of which included a bid of $17,000 for the foundation.

On July 16, 1960, the petitioner executed a written contract for the construction of the structure on his property with the contracting firm of L. E. Weisenburg, Jr. It was a cost-plus contract with an estimated construction cost of $74,723. The contractor's fee was $7,659. In some circumstances this fee might be increased due to changes or it might have been reduced but not below $3,923. The contractor was to be paid as the job progressed at the rate of 5 percent of the costs as they were incurred. At that time it was expected that the excavation of the site would be done by use of a "modified mining technique" whereby the contractor would excavate narrow trench areas, shore between them and then build his walls in those areas.

The agreement stated that the contractor was to "make such shoring during the course of the excavation and pouring of the concrete as may be required by any applicable law or ordinance." The applicable law was as follows:

UNIFORM BUILDING CODE 1955 Edition

Page 204, Sec. 2801, Excavations:

Any person making or causing an excavation to be made exceeding twelve feet (12') in depth below the grade, shall protect the excavation so that the adjoining soil will not cave in or settle, * * *

The agreement also stated that "many of the items" making up the total estimated cost of construction ($74,723) were "at the most, educated guesses or estimates, particularly concerning the excavation and foundation" and that only when portions of the soil and rock had been excavated could it be determined whether or not the foundation

could be built at an economical price in the manner specified. If it appeared that the method of excavation was uneconomical Heyn could elect to terminate the contract.

It was further provided that the concrete could be poured directly against the dirt embankment making up the excavation cut in lieu of framing prior to pouring. This is a type of construction where only one side of the wall into which one would be pouring concrete is formed. The embankment is the other side of the form. Time is of the essence in this construction method because of the necessity that the soil be stable enough to support the vertical cut of the embankment for a sufficient period of time to permit the concrete to be poured. It is not possible to pour concrete against a dirt embankment with a T-shaped foundation. Prior to the execution of the construction contract, the parties agreed that there would be an L-shaped foundation so that concrete could be poured directly against the dirt embankment, and the construction contract was written on that basis.

The City of Sausalito Building Ordinance No. 508, section 3, provides that whenever the site covered by a building permit application presents unusual problems in the opinion of the building official, a foundation plan and site check may be required. The City of Sausalito building inspector, the building official referred to in that ordinance, classified the application for a building permit on the Heyn property as an unusual building problem within the scope of the ordinance in question. He so classified the Heyn property because of the anticipated instability of the soil arising from the interaction of the water on the soil conditions and the steepness of the hillside lot.

About September 1, 1960, ground was broken at the site. Instead of excavating the site by use of the "modified mining technique" as previously outlined, the entire area was excavated, resulting in an exposed vertical embankment. On September 13, 1960, the engineering geologist employed on behalf of Heyn inspected the construction site and in particular the vertical cut slopes of the excavation. At that time, the cut was from 14 feet to 16 feet in depth. He observed water slowly seeping through "openings in the northwest corner just above and at the bottom of the excavation." There had been no measurable rainfall in, on or around the city of Sausalito, Calif., during the months of June, July, August, and September, all of 1960, so that the water seepage could not have been caused by excessive rainfall. The engineering geologist was of the opinion that the cut slopes could not be expected to be stable for more than a few days without shoring. He called this to the attention of the contractor by telephone on September 14, 1960, and that conversation was confirmed by letter the following day.

On September 21, 1960, the engineering geologist again examined the excavation together with a representative of the contractor. Two

4 by 6 support timbers, about 8 feet apart, which had been placed against the vertical cut by the contractor the previous day were bowed under the load and a slide seemed imminent. The shoring was inadequate and the engineering geologist advised the contractor to increase the shoring. The record does not disclose that such advice was followed.

By September 22, 1960, the rough excavation was substantially completed. It resulted in an exposed vertical or 90-degree cut, generally running along Atwood Avenue. The cut at its greatest depth was approximately 20 feet deep measured from the existing ground level down to the floor level of the lower carport. The cut sloped from a maximum of approximately 20 feet to a minimum of approximately 10 feet.

At approximately 4 o'clock in the morning, on September 23, 1960, an earthslide occurred at the construction site which affected a portion of the embankment from the northerly side of the excavation including the vertical cut, at or about the point of the deepest excavation and on both sides of the corner. Approximately 200 cubic yards of earth fell as a result of the earthslide. This earth came from the vertical embankment and fell into the bottom of the excavation site.

The cause of the earthslide was the extensive excavation which produced a 20-foot vertical embankment by removing the support provided by the portion of the hill that was cut away, coupled with the failure of the contractor to provide adequate substitute support with proper shoring. The need for such shoring was pointed out to the contractor or his employees on several occasions by the architect and engineers.

At the time of the September 23, 1960, earthslide construction had proceeded to the point of a rough excavation. No part of the building had been built. Only a small part of the framing or forming preparatory to the pouring of concrete had been erected, and some steel had been put in place. No concrete for the foundation had been poured and no part of the foundation had been erected.

Because of the slide, the City of Sausalito closed Atwood Avenue to traffic. Had Heyn decided to discontinue construction after the slide it appears that he might still have been required by law to provide adequate support for the roadway and the adjoining properties. However, the construction of the building was completed, and it was built substantially according to the architect's plans and specifications as finally drawn prior to the start of construction. The cost of the completed building was in excess of $100,000.

In connection with the construction Heyn expended a total of $36,066.98 for the completed foundation including concrete and steel. However, it was not established how much was incurred as construction costs prior to the slide that took place on September 23, 1960.

In his 1960 return Heyn claimed a $16,456 deduction as a "Casualty Loss—Landslide." The Commissioner disallowed the deduction in full.

As a result of the slide petitioner sustained a deductible casualty loss in the amount of $7,500 that was proximately related to such slide. The remaining portion of the $36,066.98 expended for the completed foundation represented petitioner's capital cost thereof and was not attributable to any casualty loss.

Subsequent to construction of the building there was litigation between petitioner and the contractor concerning amounts due to the contractor. Petitioner filed a cross-complaint for failure to provide the necessary support during the excavation. The court rendered a written decision but had not yet made any findings of fact or entered any judgment in that case as of the time of the hearing in the present case. In that decision Heyn was denied any remedy for breach of contract or any damages in connection with the slide.

OPINION

RAUM, *Judge:* Petitioner seeks to sustain his claimed deduction of $16,456 only as a "casualty" loss under section 165(c)(3) of the 1954 Code.[1] Two issues have been presented for decision: (1) Whether there was a "casualty" within the meaning of the statute, and (2) if there was a "casualty," whether petitioner sustained a loss in the amount claimed. We hold that the earthslide was a casualty within the meaning of section 165(c)(3), but that petitioner has failed to establish that he sustained a loss in the amount of $16,456, as claimed. We have found that his loss proximately attributable to the slide was $7,500, and that the remaining portion of the $36,066.98 expended by him for the completed foundation represented his cost thereof, a nondeductible capital item.

1. The Government argues that the landslide was not a "casualty" within the meaning of section 165(c)(3) because it was merely the product of (a) anticipated hazards of building on petitioner's property, a steep hillside lot with an unstable soil condition, and (b) faulty shoring provided by the contractor. We think that this position takes an unduly narrow view of the statute.

The physical characteristics of the landslide were plainly those normally associated with a casualty. It involved a sudden and violent

---

[1] SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \* \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

\* \* \* \* \* \* \*

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. \* \* \*

movement of a large mass of earth that was cataclysmic in character, and was similar in nature to a fire, storm, or shipwreck. Cf. *Ray Durden*, 3 T.C. 1; *Harry Johnston Grant*, 30 B.T.A. 1028, acq. XIII–2 C.B. 8; Rev. Rul. 57–524, 1957–2 C.B. 141. But cf. *Jones* v. *Smith*, 193 F. 2d 181 (C.A. 10). That it might have been foreseen or that it might have been prevented by the exercise of due care by the contractor are factors which in our opinion do not require that the landslide be denied classification as a casualty.

Of course, foreseeability may be a circumstance to be taken into account in determining whether a particular event is a casualty. But foreseeability alone is not conclusive. Meteorological forecasts may well forewarn a cautious property owner to take protective measures against an oncoming hurricane, but any ensuing losses may nevertheless be storm or casualty losses within the meaning of the law. Nor is negligence a decisive factor. Automobile accidents are perhaps the most familiar casualties today. Yet the owner of the damaged vehicle is not deprived of a casualty loss deduction merely because his negligence may have contributed to the mishap. This is made abundantly clear in the Treasury regulations, sec. 1.165–7(a)(3):

(3) *Damage to automobiles.* An automobile owned by the taxpayer, whether used for business purposes or maintained for recreation or pleasure, may be the subject of a casualty loss, including those losses specifically referred to in subparagraph (1) of this paragraph. In addition, a casualty loss occurs when an automobile owned by the taxpayer is damaged and when:

(i) The damage results from the faulty driving of the taxpayer or other person operating the automobile but is not due to the willful act or willful negligence of the taxpayer or of one acting in his behalf, or

(ii) The damage results from the faulty driving of the operator of the vehicle with which the automobile of the taxpayer collides.

We are unable to perceive any distinction between a casualty loss arising from an automobile collision and one resulting from a landslide. Certainly, in the absence of gross negligence, the mere fact that the automobile owner negligently failed to have faulty brake linings replaced or that he negligently took a calculated risk in driving with smooth tires would not deprive him of a casualty loss if his vehicle were damaged in an accident occurring as a result of either of those conditions. The accident would nonetheless qualify as a casualty, notwithstanding the owner's negligence or that the accident was the consequence of his having taken a calculated risk in respect of known hazards. And it seems clear to us that petitioner's position in respect of the landslide is no weaker. Indeed, the record does not even reveal any negligence on petitioner's part. To the contrary, the evidence indicates that the architect and engineers, acting on his behalf, were urging the contractor to take proper protective measures that might well have prevented the landslide. We hold that the slide was a casualty within the meaning of the Code.

There are numerous cases involving casualty losses, some of them difficult to reconcile with others either in result, theory, or language. We think a review of these cases would not serve any useful purpose here, since we are satisfied that on the facts before us there was plainly a casualty. Of course, to the extent that any element of the claimed loss represents merely an increased cost of the building it is a capital item that is not deductible as a casualty loss. But that relates to the *amount* that petitioner is entitled to deduct, a matter which we consider below.

2. Although we are satisfied that the landslide was a casualty, petitioner has failed to carry his burden of proving that he sustained a loss in the amount of $16,456 as a result thereof. That figure appears to be based upon the difference between (a) petitioner's actual cost of the foundation and excavation and (b) the aggregate of items of estimated cost of the foundation and excavation as they appeared in a schedule attached to the original construction contract. Petitioner makes the wholly unfounded assumption that such difference represents damages or loss caused by the slide.

It must be remembered that the contract itself explicitly called attention to the fact that the estimates in the attached schedule were "at the most, educated guesses or estimates, particularly concerning the excavation and foundation." Also, it appears likely that the slide, to a certain extent at least, merely revealed more clearly or emphasized the need for costlier construction than had previously been anticipated. Such additional elements of cost would represent nondeductible capital items rather than a casualty loss. Similarly, there is some indication in the evidence that local authorities tightened up some of their requirements or conditions in respect of construction after the slide. These, too, could represent increased capital outlays rather than casualty losses. The burden of proof in respect of this issue was upon petitioner and it has not been carried as to the full amount of the deduction claimed.

There is in evidence a mass of vouchers and receipted bills showing petitioner's expenditures in respect of the foundation and excavation. But it is impossible to make any accurate allocation between those expenditures that reflected the loss arising out of the casualty and those that represented merely the cost of the excavation and foundation. Nevertheless, it is clear that petitioner sustained some loss as a direct result of the casualty. Thus, the evidence indicates that, as a direct consequence of the slide, increased labor costs as well as expenses for lumber and possibly other materials were incurred. Similarly, the cost of removing the earth involved in the slide and of replacing some of that material with suitable fill in order to provide the necessary support for the road on Atwood Avenue may fairly be regarded as elements of damage proximately resulting from the slide. It seems

likely that there may have been other costs that could also be directly attributed to the slide and not be regarded as part of the cost of the excavation and foundation. As already indicated, the matter is not susceptible of precise determination on this record, but, doing the best we can with the materials before us we have found that petitioner sustained a deductible casualty loss of $7,500 [2] that was proximately related to the slide. Cf. *Cohan* v. *Commissioner*, 39 F. 2d 540, 544 (C.A. 2); *Austin Clapp*, 36 T.C. 905, 908, affirmed 321 F. 2d 12 (C.A. 9); *Murray Thompson*, 21 T.C. 448, 451, affirmed 222 F. 2d 893, 895 (C.A. 3); *David J. Pleason*, 22 T.C. 361, 371, affirmed 226 F. 2d 732, 734 (C.A. 7), certiorari denied 350 U.S. 1006; *Michael Potson*, 22 T.C. 912, 929, affirmed sub nom. *Bodoglau* v. *Commissioner*, 230 F. 2d 336, 341 (C.A. 7); *Pauline W. Ach*, 42 T.C. 114, 126–127, affirmed 358 F. 2d 342 (C.A. 6).

*Decision will be entered under Rule 50.*

---

[2] We recognize, of course, that the loss is measured by the difference between fair market values immediately before and after the casualty, which, however, may be established by showing the cost of repairs necessary to restore the property to its prior state, subject to the conditions set forth in Income Tax Regs., sec. 1.165–7(a)(2), and subject to the further condition that the loss may not exceed the adjusted basis of the property, sec. 1.165–7(b)(1).