MARVIN GOODFRIEND and LAURA GOODFRIEND, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Goodfriend v. Commissioner
Docket Nos. 21093-83, 23294-84.
United States Tax Court
T.C. Memo 1986-519; 1986 Tax Ct. Memo LEXIS 94; 52 T.C.M. (CCH) 845; T.C.M. (RIA) 86519; October 20, 1986. Sharon Burton Haberfeld, for the petitioners. Elaine T. Fuller, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes: Docket No.
Year
Deficiency
21093-83
1979
$12,261
23294-84
1980
74,201 After concessions by both parties, [1] the issue for decision is whether petitioners are entitled to any or all of their claimed casualty loss deduction in 1980. *95 FINDINGS OF FACT Petitioners Marvin Goodfriend (petitioner) and Laura Goodfriend resided in Malibu, California, and Santa Monica, California, respectively, at the time their petitions were filed. Petitioners filed 1979 and 1980 joint Federal income tax returns. On their 1980 return, petitioners claimed a casualty loss deduction of $135,796 with regard to their residence. That amount was calculated on the return as follows: Decrease in fair market value
$135,000 Limitation
(100)
Appraisal fees
896 $135,796 Respondent disallowed the entire amount of the claimed loss. During the years in issue, petitioners resided at 3925 Malibu Vista Drive, Malibu, California. Petitioners purchased the residence in March 1977 for $220,000. The residence is on an irregularly shaped corner lot of approximately one-half an acre, or 24,120 square feet, situated on the nose formed by the high coastal bluffs and the south wall of the Topanga Canyon. The front of the lot is a level pad area containing the house (approximately 2,100 square feet), a swimming pool, and a patio.The backyard, from which one may view the Pacific Ocean to the south, gently slopes downward *96 from the house. At or near the rear of the lot, the slope of the land is at a very steep grade down to the Pacific Coast Highway. The southern slope of the coastal bluff, below petitioners' property, has been in a weakened condition for many years, subject to occasional substantial landslides. In February 1980, petitioner discovered a fissure or crack across the south/southeastern corner of the backyard. The soil on the ocean side of the fissure had settled several inches below the soil on the house side of the fissure. The fissure and soil settlement were caused by an unusually heavy and prolonged rainfall and resulting buildup of ground water levels. The settlement area on petitioners' property encompassed approximately 3,000 square feet or about 30 percent of petitioners' backyard. The fissure was approximately 350 to 400 feet long and extended across the property of some of petitioners' neighbors to the east, including the residence at 3929 Malibu Vista Drive (the 3929 residence), which was adjacent to petitioners' residence. The settlement area on the 3929 residence encompassed approximately 13,000 square foot or about 80 percent of its backyard. Petitioners did not repair *97 the damaged area of their property. At the time of trial in December 1985, the damaged area was essentially unchanged from its condition in 1980. A Gulf Oil Company service station was located below petitioners' property at the corner of Topanga Canyon Boulevard and Pacific Coast Highway. In April and September 1980, Gulf Oil Company caused the preparation of geological diagrams of the immediate area, which reflected fissures on petitioners' property. Geologists/Engineers
Respondent's expert witness, Robert L. Hamilton (Hamilton), earned a B.S. in Mining Engineering, Geology Option, from the Texas College of Mines and Metallurgy and was, at the time of trial, employed by the Internal Revenue Service (IRS) as a mining engineer. Hamilton's experience included positions with numerous firms, many of which employed him as a geologist and most of which related to mining. Hamilton prepared an Engineer Memorandum Report dated August 6, 1985, in which he suggested that petitioners' claimed casualty loss deduction was not justified. In Hamilton's opinion, the failure on petitioners' property was "restricted to the fill (the gravels)," and the gravels were probably sliding *98 along the top of bedrock. He stated that to the east of petitioners' property was an area of major sliding and that the surface soil area in petitioners' property was simply moving into the slide area. To stabilize the movement area, Hamilton noted, would probably cost more than the value of the property. At the time of trial, Bob Kirby (Kirby), respondent's other expert witness, was employed by the IRS as a general engineer. Kirby received a B.S. in Civil Engineering from California State University and attended two classes or workshops offered by the Society of Real Estate Appraisers. Kirby commenced employment with the IRS in 1981 and, in his capacity as a general engineer, applied his engineering knowledge anid skills together with a knowledge of the Internal Revenue Code and Regulations to valuation engineering studies. Based on his examination of the property and certain assumptions by geologist Hamilton, it was Kirby's opinion that petitioners suffered an actual physical loss to their residence and that the damage was reparable by adding soil or fill dirt. Accordingly, Kirby concluded that petitioners should be entitled to a casualty loss deduction based on the actual *99 cost to repair the property, which would be nominal. One of petitioners' expert witnesses was Eugene D. Michael (Michael), who held a bachelor's degree and a master's degree in geology. At the time of trial, he was a consulting geologist specializing in engineering geology and hydrogeology with emphasis on slope stability. He was a registered geologist and certified engineering geologist. He maintained several professional affiliations, and authored numerous articles relating to geology and landslides. Since September 1983, Michael had supervised the "dewatering" of the Big Rock Mesa landslides in Malibu. Michael was familiar with landslides on the southern slope below petitioners' property that occurred in 1934, 1941, and 1971. Michael examined the subject property in 1980 and again in 1985. In Michael's opinion, the failure and soil movement was a deep-seated landslide commonly referred to as a slump, and the plane of failure extended much deeper than the gravel layer, as suggested by respondent's experts.Michael concluded that the property could be restored only by supporting the entire slope, that remedial work would be very costly, possibly greater than the property's *100 value, and that installation of a retaining wall and impartation of earth fill would not stabilize the property. Dimitry Vergun (Vergun) also testified for petitioners. Vergun received a bachelor's degree from M.I.T. and an M.S. in Structural Engineering from Stanford University and was a structural engineer at the time of trial. He was a registered civil and structural engineer and a registered architect. He had supervised over 100 hillside design projects and had been engaged as a consultant on 14 slide impact projects. Vergun inspected petitioners' property about a week before the trial and reviewed respondent's experts' reports and the report prepared by Michael. Based on his observations, and information in the other reports, Vergun determined that a scarp cut across petitioners' lawn indicating that the top of the bluff was unstable. He estimated that the bluff had a safety factor of 1.0, "meaning a state of precarious equilibrium which could easily be disturbed by earthquake, rain or human activity such as construction or other vibration producing activity." Vergun recommended two methods of removing the hazard, removing the slide mass or installing soldier piles. He *101 also noted that the cost to restore the property to its pre-casualty condition might exceed $300,000. Vergun stated that fill dirt or a retaining wall would only implicate further damage and that no permit would be granted for such projects by the County of Los Angeles Department of Building and Safety. Valuation Experts
Petitioners based the amount of their claimed casualty loss deduction on an appraisal report prepared in 1980 by John Kennedy and Associates, which incorporated findings of geologist Michael. Although the appraisal was attached as an exhibit to Kirby's report, petitioners did not introduce any testimony in support of the appraisal and stated in their trial memorandum that they could not locate the agent who had prepared the appraisal. Petitioners' valuation witness at trial was Jane Abrams (Abrams). At the time of trial, Abrams was a licensed real estate agent and broker and was employed by Merrill Lynch. She had taken one appraisal class. She was familiar with and had sold homes in Santa Monica, Pacific Palisades, and Malibu. In her report dated December 4, 1985, Abrams considered comparable sales to assist her in determining the loss in value *102 to petitioners' property. To determined the pre-casualty value, she identified two sales in the area of petitioners' property. Those sales occurred in September 1980 and January 1981, and the selling prices were $495,000 and $520,000, respectively. After adjustments for time and for differences in the lots and improvements, Abrams determined a pre-casualty value of petitioners' property of $450,000 to $475,000. To determine the post-casualty value of petitioners' property, Abrams considered two sales, one of which was the 3929 residence. The 3929 residence was damaged by the same fissure in 1980 that damages petitioner's property, and it sold in November 1982 for approximately $320,000. Abrams described both the lot and house as less desirable than those of petitioners and concluded that the pre-casualty value of the 3929 residence was $375,000. [2] She then discounted the November 1982 selling price of the 3929 residence to a post-casualty value of $250,000 to $275,000, resulting in a loss in value of approximately $100,000 to $125,000. The other sale Abrams considered was a residence in Pacific Palisades, California, near Malibu. Abrams described its location as less desirable *103 than that of petitioners' residence. The house had been listed for sale at $380,000 in late 1980 and early 1981, and Abrams determined that its value at that time was $360,000 to $370,000. It sold in August 1982, after a "crack" and earth movement similar to the one on petitioners' property, for $235,000. Based on this information, Abrams reached the following conclusions of value with regard to petitioners' property: Before casualty
$450,000 to $475,000
After casualty
$275,000 to $310,000
Diminution
$140,000 to $200,000
Respondent's valuation expert was Lorene Sams (Sams). At the time of trial, Sams had been a real estate appraiser for the IRS since 1981. She had participated in numerous classes, seminars, and conferences on real estate appraisal and valuation. Her experience included appraisals in California, Hawaii, Oregon, Utah, and Washington. In her appraisal report dated November 22, 1985, Sams described two methods of valuing *104 petitioners' property: the direct sales comparison approach and the cost approach. Under the direct sales comparison approach, Sams selected the following four sales in the general vicinity of petitioners' property that she considered to be the most similar as to all major factors of comparison: Sale
Sale
Date
Price
Description (approximations)
(1)
2/9/79
$275,000
Malibu, ocean view, 3,000 sq. ft.
house, 11,000 net sq. ft. lot,
no pool
(2)
11/2/78
277,500
Malibu, ocean view, 2,200 sq. ft.
house, 6,000 net sq. ft. lot,
no pool
(3)
6/16/80
415,000
Malibu, ocean view, 1,800 sq. ft.
house, 48,000 sq. ft. lot, no pool
(4)
3/10/80
380,000
Pacific Palisades, ocean view,
2,000 sq. ft. house, 7,800 sq. ft.
lot, no pool
Based on these selected comparables, Sams determined a precasualty value of petitioners' property of $400,000. The direct sales comparison approach, Sams noted, is difficult for purposes of determining a post-casualty value because of the dearth of any comparables with similar damage. Although Sams did not otherwise verify the information, she, too, considered the sale of *105 the 3929 residence in November 1982 for $320,484. Sams computed a loss in value to that parcel of $125,000 (pre-casualty value of $400,000, based on the same pre-casualty value analysis applied to petitioners' property, and post-casualty value of $275,000 by discounting the sales price to February 1980). Based on the size of the damaged area of the 3929 residence, Sams calculated a loss in value of the damaged area of $9.60 per square foot. Applying this amount to petitioners' 3,000 square feet of damaged property, Sams determined a loss in value to petitioners' property of $28,800, rounded to $30,000. Thus, Sams determined a post-casualty value of petitioners' property of $370,000. The direct sales comparison approach, according to Sams, is more reflective of the typical buyer and more reliable than the cost approach; however, Sams used the cost approach of valuation simply as a check. Under the cost approach, Sams determined the cost of reproducing the improvements, less depreciation, to which she added the fair market value of the land, assumed vacant. In calculating the value of the land, Sams considered the current value per square foot of buildable lots and nonbuildable *106 lots. Accordingly, Sams computed a pre-casualty value of petitioners' property of $400,000 as follows: Main Building
$114,000 (2136 sq. ft. X $53.50)
Site Improvements (25%)
28,500 Estimated Reproduction Cost
$142,500 Depreciation: Physical (20%)
(28,500)
Land Value
285,000 Indicated Value
$399,000 Rounded to
$400,000 After consulting with Kirby and Hamilton, Sams estimated a $10,000 cost to repair the property. Thus, she added a $10,000 depreciation deduction to the above schedule and thereby determined a post-casualty value of approximately $390,000 under the cost approach. OPINION Section 165(c)(3)[3] allows a deduction to individuals for losses of property not connected with a trade or business arising from fire, storm, shipwreck, or other casualty. Respondent agrees that petitioners incurred a casualty loss in 1980. In dispute is the amount of petitioners' deductible casualty loss. *107 Petitioners argue that the value of their property declined $135,000 as a result of damage from a deep-seated landslide that occurred in February 1980. The fissure on petitioners' property, they contend, is the boundary or slide plane of that landslide. Respondent argues that the actual landslide is east/southeast of petitioners' property and that the fissure and soil settlement area on petitioners' property is simply the movement of surface soil toward the landslide area. Accordingly, respondent argues that the actual damage to petitioners' property and, hence, the casualty loss deduction are nominal. The amount of a casualty loss deduction is generally computed as the fair market value of the property immediately before the casualty minus the fair market value of the property immediately after the casualty, not to exceed, however, the adjusted basis of the property. See Helvering v. Owens,305 U.S. 468 (1939); Millsap v. Commissioner,46 T.C. 751 (1966), affd. 387 F.2d 420 (8th Cir. 1968); sec. 1.165-7(b)(1), Income Tax Regs. *108 The determination of these respective values "shall generally be ascertained by competent appraisal;" moreover, any such deduction "shall be limited to the actual loss resulting from damage to the property." Sec. 1.165-7(a)(2)(i), Income Tax Regs. As an alternative, the regulations allow the cost of repairs to the property as evidence of the loss of value. Sec. 1.165-7(a)(2)(ii); Income Tax Regs. The cost of repairs alternative, however, must be based on actual repairs and expenditures, not estimates. Lamphere v. Commissioner,70 T.C. 391 (1978). Petitioners have the burden of proving the amount of the casualty loss deduction. Rockwell v. Commissioner,512 F.2d 882, 885-887 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; Pfalzgraf v. Commissioner,67 T.C. 784, 787 (1977); Heyn v. Commissioner,46 T.C. 302 (1966); Rule 142(a), Tax Court Rules of Practice and Procedure.
In Kamanski v. Commissioner,477 F.2d 452 (9th Cir. 1973), affg. a Memorandum Opinion of this Court, a mudslide near taxpayers' residence caused minor physical damage to their property. *109 Taxpayers thereafter sought a casualty loss deduction based on the $23,000 diminution in value of the property after the mudslide. The Court of Appeals for the Ninth Circuit, to which this case is appealable, held: The loss claimed by taxpayers was not attributable to the slide itself, but to the existence of soil conditions that the occurrence of the slide served to demonstrate. The loss in market value was not due to damage caused by the casualty, but to buyer predictions that future casualties would cause further damage. This may well be an accurate prediction but the claim of loss must await the event.Loss of value based upon such a prediction is not deductible as casualty loss under sec. 165(c)(3). SeeSquirt Co. v. Commissioner, 423 F.2d 710 (9th Cir. 1970) [affg. 51 T.C. 543 (1969)]; Pulvers v. Commissioner, 407 F.2d 838 (9th Cir. 1969) [affg. 48 T.C. 245 (1967)]. [477 F.2d at 452-453. [4]] In this case, although we are persuaded that the fissure on petitioners' property was deep-seated and marked the slide plane of the landslide, petitioners have not proven that the actual physical *110 damage occurring in February 1980 was as extensive as they claim or that the difference in market values asserted by Abrams reflected actual damage rather than speculation as to future damage, unrealized and nondeductible.
Opinion testimony of an expert is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702. Such evidence must be weighed in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Christ v. Commissioner,480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment. Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955); *111 Tripp v. Commissioner,337 F.2d 432 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; In re Williams' Estate,256 F.2d 217, 219 (9th Cir. 1958), affg. a Memorandum Opinion of this Court. Valuation questions, such as we have here, are inherently incapable of precise resolution and require "weighing all the facts and circumstances * * * with due regard to the burden of proof placed on each of the parties by law." Messing v. Commissioner,48 T.C. 502, 512 (1967). We have considered the reports and testimony of the expert geologists and engineers for both parties. On the whole, however, the analysis and report by Michael, petitioners' witness, is the most persuasive. His credentials were solid, his testimony credible and unshaken by respondent's *112 cross-examination, and his determinations consistent with and corroborated by certain documents prepared for Gulf Oil Company. We accept his conclusions regarding the location of the plane of failure and the damage to the property. He did not, however, give an opinion on the ultimate issue, i.e., the reduction in fair market value attributable to the physical damage. The appraisal reports and testimony of valuation experts for each party are sparse in supporting information and leave a great deal to speculation. We are not fully persuaded by any one of these expert's opinions. We must therefore make our best judgment on the record provided by the parties, although we are not confident that our conclusions would be the same if better evidence were available. The appraisal report prepared by John Kennedy and Associates in 1980 is in the record only as an exhibit to Kirby's report. It is hearsay and cannot be relied on by petitioners. (If it were properly before us, however, we would reject its conclusions because they are based (1) on predictions of damage that might occur subsequent to 1980 and (2) on an arbitrary and unexplained use of a percentage (30 percent) "added depreciation. *113 " See Thornton v. Commissioner,47 T.C. 1, 7-8 (1966).) By using the market comparison approach, Abrams, petitioners' valuation expert at trial, and Sams, respondent's valuation expert at trial, determined relatively similar precasualty values of the property. Moreover, they each considered the 1982 sale of the 3929 residence for purposes of computing the post-casualty value. This sale was especially useful because the 3929 residence was damaged by the same fissure that damaged petitioners' property.By discounting the sales price to immediately after the casualty, Abrams and Sams calculated losses in value to the 3929 residence (attributable to the casualty) of $100,000 to $125,000 and $125,000, respectively. Abrams failed to explain how she determined from this information a diminution in value of petitioners' property of $140,000 to $200,000. We cannot, therefore, rely on her unsupported conclusion. Sams' opinion, however, was based on more data and was more thoroughly explained. Sams considered the difference in the sizes of the damaged area on each parcel. Because the damaged area on the 3929 residence was approximately 13,000 square feet (about 80 percent *114 of its back yard) compared to an damaged area of approximately 3,000 square feet on petitioners' residence (about 30 percent of petitioners' back yard), Sams determined that the loss in value to petitioners' property resulting from the physical damage was approximately $30,000. We are persuaded by the need to adjust comparable values for the difference in the sizes of the damaged areas. Petitioners' valuation expert made no such adjustment, and the record does not support an intermediate position. We therefore accept the conclusion of Sams that the amount of petitioners' casualty loss attributable to actual physical damage is $30,000. Petitioners have not proven that any of the additional amount of their claimed casualty loss is deductible. Decision will be entered under Rule 155.
Footnotes
1. At trial petitioners asserted, and respondent denied, a settlement agreement with respect to a computer leasing issue for which petitioners claimed deductions on their 1979 and 1980 tax returns. The Court ruled that petitioners' purported acceptance had not been adequately and timely communicated. Petitioners have abandoned this issue in their briefs.↩
2. In her written report, she valued this property at $400,000 to $440,000; after revisiting the site before trial, she changed the value to reflect a smaller back yard than she had remembered when preparing her report.↩
3. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
4. Inexplicably, Kamanski v. Commissioner,477 F.2d 452↩ (9th Cir. 1973), was not discussed in any of the briefs filed by the parties, although it was relied on and quoted in Kirby's report.