HERBERT P. AND BONNIE J. RADDING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Radding v. Commissioner
Docket No. 23811-85.
United States Tax Court
T.C. Memo 1988-250; 1988 Tax Ct. Memo LEXIS 283; 55 T.C.M. (CCH) 1029; T.C.M. (RIA) 88250; June 7, 1988. William H. Brown, for the petitioners. *285 Stephen R. Asmussen, for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in petitioners' income taxes for 1981 and 1982 in the amounts of $ 6,507 and $ 22,608. After concessions by respondent, the issues for decision [1] are (1) whether respondent's determination with respect to 1981 is barred by the statute of limitations; (2) whether petitioners are entitled to casualty losses in 1981 and 1982 in the amounts of $ 50,000 and $ 65,000, respectively, resulting from earth slides; and (3) whether damages should be awarded to the United States under section 6673. [2]
Many of the facts have been stipulated and are incorporated herein by this reference. When they filed their petition, petitioners resided in Saratoga, California. For the years at issue, petitioners filed joint individual income tax returns *286 with the Internal Revenue Service Center in Fresno, California. Petitioners' return for 1982 was timely filed. On or about January 11, 1984, petitioners filed an amended 1982 return. For convenience, we have combined findings of fact and opinion by issue. Statute of Limitations -- 1981
Petitioners allege their 1981 return was mailed to the Service Center on April 14, 1982. The return was stamped "Received June 2, 1982." The stamp was marked over by hand to read "June 3, 1982" by personnel at respondent's Service Center. Respondent's notice of deficiency on which this case is based was mailed to petitioners on May 22, 1985. Respondent did not determine any addition to tax pursuant to section 6651 for late filing with regard to 1981. The parties have stipulated that petitioners attached an appraisal of the fair market value of their residence to their 1981 return. The appraisal was mailed in an envelope bearing a postmark dated June 1, 1982. The Service Center stapled the envelope to the back of the appraisal. No "received" date was stamped on the appraisal. When a return is received in the Fresno Service Center mailroom, it is not date stamped if it is timely filed. *287 If it is filed late, the date it is received is stamped thereon. If the document is received late, the envelope is ordinarily attached to the return. In addition to the received date of June 3, 1982, petitioners' 1981 return bears a document locater number (DLN) assigned by the Service Center. The DLN stamped on petitioners' 1981 return is 89-211-156-219-49. Each component has a meaning. The middle segment, 156, indicates the 156th day of the year which is June 5, the date the DLN was stamped on the return. It normally takes approximately 2 days for a return to move from the Service Center's mailroom to the section where the DLN is entered. Respondent's witness, Nancy Ramos, custodian of Fresno Service Center records, opined that the return and appraisal were mailed to the Service Center in the same envelope. She based her opinion on the June 1 postmark, the June 3 received date stamped on the return, the June 5 date indicated by the DLN, and the fact that no received date was stamped on the appraisal. The absence of a received date on the appraisal indicates that some other document was attached to the appraisal, and that the other document was stamped instead of the appraisal. *288 The fact that no separate envelope was stapled to the return, as would ordinarily be the case with a late return, adds support for the likelihood that the return and appraisal were mailed together in the envelope postmarked June 1, 1982. In addition, respondent's Certificate of Assessments and Payments shows petitioners' 1981 return was processed on June 5, 1982. Under the general statute of limitations provided in section 6501(a), respondent must assess the amount of a tax deficiency within 3 years after the taxpayer files his or her Federal income tax return. Pursuant to section 6501(b) a return filed early is deemed filed on its due date. The mailing of a notice of deficiency suspends the running of the three-year statute of limitations on assessment until 60 days after the final resolution of any Tax Court litigation. Section 6503(a)(1). The Commissioner's failure to timely mail a notice of deficiency to a taxpayers bars the assessment of such determined deficiency. Where a return is mailed *289 so as to bear a United States postmark on or before the due date and received by respondent after the due date, the return is treated as having been timely filed. Section 7502(a); Miller v. United States,784 F.2d 728, 730 (6th Cir. 1986). If the return is mailed after the due date, the return is considered filed as of the date it actually is received by respondent. We think the evidence in this case is overwhelming that petitioners' 1981 return was not mailed on April 14th or 15th as petitioners claim. We find instead that petitioners mailed their 1981 return to the Service Center on June 1, 1982, and that it was received on June 3, 1982. The statutory notice mailed to petitioners on May 22, 1985, is therefore timely. Casualty Loss
Petitioners purchased their principal residence located at 14050 Chester Avenue in Saratoga, California, on or about February 4, 1977, and moved in on or about June 10, 1977. [3] Petitioners experienced the first of four problems with mud slides in December 1977. At that time a portion of the hill to the rear of petitioners' house turned into liquified mud following a heavy rain fall, oozed over the original retaining wall *290 on petitioners' property, and piled up about 30 inches of mud against the house. Gigantic streams of mud and water shot out 6 feet into the garage, ruining a deep pile carpet and inside closets and walls in the back of the house, all of which had to be replaced. Petitioners' swimming pool, then under construction, collapsed. After the first slide in 1977, petitioners hired a contractor to remove the mud and dirt from the slide area and reposition it and to cut a swale into the hillside in order to catch and redirect the surface water runoff from the area. These repairs were successful; the affected area has not slid again. During the winter of 1978-1979, petitioners experienced debris slides in two different areas of their property -- one in the back and one in the front. There was extensive cracking in a 350 foot area in the front part of their yard. In the *291 back, petitioners' concrete pool deck cantilevered out, and the cyclone fence which petitioners had constructed around the pool was hanging in midair. After the second slides, petitioners hired contractors who removed the dirt in the front part of their yard, brought additional dirt, compressed the dirt until hard, and reconstructed the entire front hillside including the installation of underground drains. These repairs were successful, in that petitioners have not experienced subsequent slides in the front yard. With respect to the slide problems occurring in the rear of their property, petitioners extended the trench that was built after the first slide to a full 350 feet across the backyard. Also, the trench was deepened to a depth of 7 to 9 feet, and 4 inch pipes and gravel were added to facilitate drainage. On June 19, 1980, petitioners filed a third amended cross-complaint [4] against (among others) Project IV Ltd., Inc. and Lloyd Bradhoff, who were the builders of their home. That cross-complaint, filed prior to the mudslides in issue in this case, contained a number of causes of action, many of which are not relevant to this case. However, the tenth cause of action, *292 for fraud, alleges that the representations of Lloyd Bradhoff that the subject property was set on good, solid hillside with no danger of water or soil runoff were in fact false, and that the true facts were: 1. The hillside on which the subject real property was placed is highly unstable and susceptible to runoff, slippage and subsidence. 2. A foreseeable amount of rain would cause the hillside to crack, slide and collapse. 3. A foreseeable amount of rain would cause substantive quantities of water and dirt to slide down the hillside and to Cross-Complainants' home. In the sixth cause of action of the above-referenced cross-complaint, for negligence against the builder of the house, petitioners alleged that on and prior to January 31, 1977, Project IV Ltd. and others so negligently tested, surveyed, designed, engineered, manufactured, cut, graded, filled, compacted, terraced, leveled, landscaped, improved and modified petitioners' property as to cause "latent subsurface defects in the property. *293 " Petitioners received a judgment on this cross-complaint on November 17, 1981, in the amount of $ 11,977.25. Petitioners collected $ 14,730.13 on this judgment (including interest) from Lloyd Bradhoff, on or about June 5, 1984. Petitioners claimed casualty losses on their income tax returns for 1978 and 1979 in the amounts of $ 29,900 and $ 59,900, respectively. After a jury trial in the United States District Court for the Northern District of California, petitioners were allowed the full loss claimed for 1978, but the 1979 loss was completely disallowed. Petitioners did not suffer any slides during 1980 and 1981. However, on March 31, 1982, after more than 8 inches of rain had fallen in five days, landslide number three occurred behind petitioners' house at a location removed from the area of the first two landslides. Because there were many other slides in the same area, petitioners' county and neighboring counties were declared disaster areas by the President pursuant to the Disaster Relief Act of 1974. In accordance with section 165(h)[5] and section 1.165-11, Income Tax Regs., petitioners elected to claim the loss deduction in the immediately *294 preceding tax year, i.e., 1981. [6]
Petitioners claimed a casualty loss for 1981 in the amount of $ 49,900. Following the 1982 slide, petitioners again hired engineers to move the dirt back into its correct position, to compact it, and to add drain lines and prepare the back for replanting. The fourth set of slides occurred on or about March 1, 1983, in an area of petitioners' backyard in which petitioners had apricot trees. The slide followed an unprecedented rainfall. [7] Petitioners had suffered 32 inches of rain by the end of January, but the ground remained stable. Rain began to fall harder around February 24, with about 5 inches falling by February 28. On March 1st it rained 3.64 inches, and slide number four began in an area where there was a stand of 50-year-old apricot trees. Petitioner *295 described what happened: When the rains at the end of February came in such a torrential downpour, my wife noticed that the iceplant that was in this region and the grass began to look a little strange like it was dying or moving or something, and stretching, and she called me and I looked at it and you could see a small crack appearing over on the right hand side of the number four slide area, and the crack began to move very rapidly across the whole back of the hillside up above. On the top of the property line, the crack began to move and then we noticed that the actual slope of the hill was changing. It wasn't moving, it wasn't liquifying like it had before in these other areas, this was just one gigantic chunk of earth, I though it looked like it was 100 feet across, it was probably only 40 or 50 across from the left side, * * *. And from the topmost area that the arc occurred down to the front slide that began to pop up, that's about 20 feet. And that large chunk just started to roll out like it was scalloped out of the hill.
Q. Is there a name for this type *296 of slide?
A. I think, I believe I was told it was a rotational slide, as opposed to the others which were considered debris slides, * * *. * * * So, this was like a scalloped part of the hillside and it started to rotate and just move down the hill and --
THE COURT: What happened to the trees, they didn't hold it? Did the trees come too?
THE WITNESS: The apricot trees dropped down. There was a trench that occurred behind us that was 9 feet deep and the apricot trees dropped down into the trench, I lost them all. The only tree I have left on my property I think is the one that's over here * * *. The roots just -- there was no dirt around the roots after this thing just moved, it just -- it's just a great big section of the hill that just scalloped out and started moving down. * * * I ran some calculations out on this thing here recently. It said that if it's 40 feet wide and 20 feet deep -- thick, rather, and 9 foot deep, that that constituted a section of the earth that was 267 cubic yards, approximately, and it was totally wet, and that weight it was about 933 tons of earth in one chunk and there was no way that I could do anything. It just moved. It came *297 down the hill and the sheer weight of it cut right through my 9-foot trench, severed all the buried pipes, so that all the water that was coming off in this area and directed by the underground pipes into this area now just came right onto this area. * * * Anyway, this came down and it collapsed the trench, it collapsed the hill and it just shoved everything in front of it as it was moving and it started destroying the hillside coming down. * * * [Transcript 66-70.]
Most of the mud stopped at a block wall behind petitioners' house, which petitioners were able to raise higher by putting in 4 by 8 foot sheets of plywood all along the top. But some dirt came through the sides and bent over the fencing. It came onto the patio and into the lawn area and plugged up drains, damaged all the underground drain systems plus all the landscaping and all the sprinkler systems. Some mud got into the swimming pool and spa. Water came through the house on one side. After the rains stopped petitioners brought in an engineer, who designed a second wall behind the house. Engineering consultations, fence repairs and miscellaneous costs totaled $ 6,953. The new all was 6 feet high. Its *298 foundation was extensive, with piers sunk 20 feet into the hillside. The retaining wall cost $ 18,000. In addition, petitioners again cleaned up the debris and moved the dirt back into different areas where it could be compacted. A pad was cut for the foundation of the retaining wall. Those repairs cost $ 12,000. Repair costs including the retaining wall totaled $ 36,953. With respect to this 1983 slide, petitioners claimed a casualty loss of $ 65,000 on their 1982 income tax return again on the basis of Presidential proclamation of a disaster area, [8] allowing the loss to be claimed in the prior year. Petitioners were reimbursed $ 34,000 in late 1984 from their homeowner's insurance company with respect to the 1983 slide. Petitioners did not report that amount as income on their 1984 return, purportedly because respondent was challenging their casualty loss deductions. They now state however, that if the casualty loss is allowed in 1982, the insurance recovery should be reported as income in 1984. Petitioners did not file a claim with their homeowner's insurance *299 company with respect to the 1982 slide. Respondent contends that: (1) The mudslides were not sufficiently sudden or unexpected to qualify as casualties under section 165(c)(3); (2) if we find that casualties occurred in 1982 and/or 1983, the measure of loss should be limited to the cost of repairs, excluding, in 1983, the cost of the fence and retaining wall which should be capitalized; and (3) if we find the casualty losses are otherwise allowable, they should be offset by the insurance reimbursement and the judgment received in the suit against the builder. Petitioners argue that: (1) The mudslides were certainly sudden, and that suddenness is sufficient to qualify as a casualty, whether or not the slides were also "unexpected", i.e., foreseeable; (2) the measure of damages is the difference in value immediately before and after the event as determined by an appraiser, even if the diminution in value exceeds the cost of repairs, when such repairs do not bring the property to its original condition; and (3) that insurance reimbursement received in a later year does not reduce the loss in the year claimed but should be included as income in the year received. Petitioners also *300 contend that the recovery from the builder was in damages for mental distress and should not be considered compensation for the landslide damage which, in any event, was related to years not in issue here. Section 165(a) allows the deduction for losses sustained during the taxable year which are not compensated for by insurance or otherwise. In the case of an individual, section 165(c) limits these loss deductions to (1) losses incurred in a trade or business; (2) losses incurred in any other transaction entered into for profit; and (3) other losses, if such losses arise from "fire, storm, shipwreck, or other casualty * * *." Petitioners claim a loss deduction attributable to an "other casualty." An "other casualty" has been held to occur: wherever unexpected, accidental force is exerted on property and the taxpayer is powerless to prevent application of the force because of the suddenness thereof or some disability, [so that] the resulting direct and proximate damage causes a loss which is like or similar to losses arising from the causes specifically enumerated in section 165(c)(3). *301 * * * [White v. Commissioner,48 T.C. 430, 435 (1967).] We hold that the earthslides involved here were casualties within the meaning of section 165(c)(3). In Heyn v. Commissioner,46 T.C. 302 (1966), the government argued that the landslide therein was not a casualty because it was merely the product of anticipated hazards of building on a steep hillside with unstable soil conditions and a faulty shoring provided by the contractor. We said: The physical characteristics of the landslide were plainly those normally associated with a casualty. It involved a sudden and violent movement of a large mass of earth that was cataclysmic in character, and was similar in nature to a fire, storm, or shipwreck. [Citations omitted.] That it might have been foreseen or that it might have been prevented by the exercise of due care by the contractor are factors which in our opinion do not require that the landslide be denied classification as a casualty. [46 T.C. at 307-308.]
We further stated that, while foreseeability may be a circumstance to be taken into account in determining whether a particular event is a casualty, foreseeability *302 alone is not conclusive. For example, homeowners in areas susceptible to hurricanes or earthquakes are not thereby denied casualty losses when damage occurs from one of these events. Similarly, the owner of a damaged vehicle in an automobile accident is not deprived of a casualty loss deduction merely because his negligence may have contributed to the mishap. Moreover, petitioners in this case had successfully repaired damage from prior slides, so that they did not recur. The slides involved herein occurred at places separate from those in which slides had previously occurred. They occurred suddenly, because of massive and unexpected amounts of rainfall, and not because of petitioners' negligence. Although we are satisfied that the landslides were casualties, petitioners have failed to carry their burden of proving that they sustained losses in the amounts claimed. Section 1.165-7(a)(2) provides as follows: (2) Method of valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after *303 the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property. (ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty. Petitioners submitted appraisals by Robert Peck, whose findings can be summarized as follows. His appraisal dated March 31, 1982 (Exhibit 5-E) stated that the fair market value of petitioners' residence, without adjustment due to slides in the year of appraisal, i.e., 1982, was $ 615,000. The appraisal shows the net value of residence *304 as of the date of appraisal (after adjustment for slides) is $ 565,000, or a diminution in value due to 1982 slides of $ 50,000. Mr. Peck's appraisal dated August 15, 1983 (Exhibit 7-G) shows a fair market value of the residence on that date, without adjustments for slides in 1983, of $ 628,000. After the 1983 slides, Mr. Peck finds the value at $ 563,000, or a $ 65,000 diminution in value for 1983. According to Mr. Peck, then, had the 1983 slides not occurred, the fair market value of petitioners' residence would have increased from $ 565,000 on March 31, 1982, to $ 628,000 on August 15, 1983. This represents an increase in value of $ 63,000 (or approximately 10 percent) in only 16-1/2 months. Furthermore, the house would have increased in value from $ 200,000 (the purchase price in 1977) to $ 628,000 in 6 years despite alleged "permanent diminutions" in value due to the 1977, 1979, and 1982 slides. Where alleged losses result from a mere fluctuation in value, there is no deductible loss. Thornton v. Commissioner,47 T.C. 1 (1966); Peterson v. Commissioner,30 T.C. 660 (1958). *305 [9] See also Pulvers v. Commissioner,407 F.2d 838 (9th Cir. 1969), affg. 48 T.C. 245 (1967). (No deduction allowed where landslide destroyed neighboring homes, but there was no actual physical damage to taxpayer's property; casualty loss depends upon actual physical damage, not hypothetical loss, mere fluctuation in value, or temporary buyer resistance.) However, loss of value due to permanent buyer resistance after a flood could be claimed as a casualty loss. Finkbohner v. United States,788 F.2d 723 (11th Cir. 1986). We hold, based upon petitioners' own expert testimony, that there was no permanent diminution in value to petitioners' home caused by the 1982 slide. *306 [10]
Petitioners have not submitted evidence of actual expenses incurred to make repairs caused by the 1982 slide. Petitioner-husband testified, however, that he hired engineers to move the dirt back into its correct position, to compact it, to add drain lines, and to prepare the back for replanting. Under section 1.165-7(a)(2)(ii), Income Tax Regs., petitioners would be allowed to deduct the cost of actual repairs to the property. Based upon records submitted regarding the 1983 damage, showing that similar repairs made by GEM Engineering cost $ 12,000, and allowing for inflation and the fact that the 1983 repairs included cutting a pad for the foundation and retaining wall (work which was not performed in 1982) we estimate that petitioners incurred actual repair costs due to the 1982 slide in the amount of $ 10,000. See Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). This amount was not compensated by insurance, and we therefore find that *307 it is deductible on petitioners' return for 1981. See Hickman v. Commissioner,207 F.2d 460 (4th Cir. 1953), affg. a Memorandum Opinion of this Court (Loss sustained as a result of hurricane damage to cottage fixed at amount paid to recondition the property); Kamanski v. Commissioner,477 F.2d 452 (9th Cir. 1973), affg. a Memorandum Opinion of this Court (Homeowner entitled to deduct only amount of loss suffered due to physical damage caused by landslide; additional loss in market value was due to buyer resistance and willingness of financial institutions to make loans in the area). With regard to the 1983 mudslide, the insurance recovery in 1984 was directly connected to losses claimed for the fourth slide which occurred in 1983 and was deducted in 1982. Any loss, in order to be properly deductible, must not be compensated for by insurance or otherwise. Section 165(a). Petitioners were not compensated in the year of the loss, but in a later year. Therefore, the question is whether, at the time the 1982 return was filed, there existed a reasonable *308 prospect of recovery on a claim for reimbursement from insurance with respect to the 1983 slide. Section 1.165-1(d)(2)(i), Income Tax Regs. The record is silent as to when petitioners' insurance claim was filed for the 1983 slide; however, since $ 34,000 was recovered in the subsequent year, we find that there did exist a reasonable prospect of recovery at the time the deduction was claimed. The loss would therefore be deductible, if at all, in the taxable year when the insurance claim is finally settled. See Commissioner v. Harwick,184 F.2d 835 (5th Cir. 1950), affg. a Memorandum Opinion of this Court; Licht v. Commissioner,37 B.T.A. 1096 (1938). Petitioner has not met his burden of proving that there was no reasonable prospect of recovery through insurance at the time the loss was sustained; no loss with regard to the 1983 slide is therefore deductible in 1982. Section 6673 Damages
Section 6673 provides that the Court may award up to $ 5,000 in damages where it finds that a taxpayer has instituted or maintained proceedings *309 before the Tax Court primarily for delay or where the taxpayer's position is frivolous or groundless. Respondent urges the Court to impose such damages, on the ground that petitioners have previously litigated the issue of the deductibility of mudslides regarding the same property. Respondent further contends that, upon hearing the District Court's verdict disallowing their second casualty loss, petitioner husband turned to petitioner wife and stated, "that screws us for the subsequent years." Respondent argues that this statement proves that petitioners are aware that their position herein is frivolous and groundless. We disagree. In the first place, during the lawsuit in the District Court, petitioners won a casualty loss in the first year and lost in the second year. Since they had one victory, and since each year stands on its own, we do not believe that petitioners were thereby notified that any subsequent mudslides would not be casualties. Secondly, petitioner husband explains his remark as meaning that his concern was not the validity of subsequent lawsuits but the necessity of having to pursue them at all. Finally, we note that respondent conceded some issues in this *310 case regarding depreciation. Since petitioners, in effect, prevailed on one issue in this case, we cannot conclude that their suit was frivolously brought. Furthermore, this suit involved separate incidents from those that occurred in prior years, incidents which did not flow from the matters decided in the District Court case. For the above reasons, we find that petitioners are not liable for damages. Decision will be entered under Rule 155.
Footnotes
1. Respondent has conceded all issues relating to depreciation deductions. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Petitioner husband testified he moved in in June 1977. According to stipulated Exhibit 18-R petitioners moved into the house on June 10. However, stipulated paragraph 5 says petitioners moved in on or about July 10, 1977. We assume this was a typographical error. In any event, the discrepancy is not material. ↩
4. The cross-complaint (Exhibit 15-O), was received in evidence over petitioners' hearsay objection as an admission by a party opponent, rule 801(d)(2), Federal Rules of Evidence.↩
5. Now section 165(i)↩. 6. In his reply brief respondent for the first time alleges that petitioners have not proven that they come within the Disaster Relief Act. Respondent does not indicate whether he is referring to the 1982 slide or the 1983 slide, or both. In any event, this issue was untimely raised, giving petitioners no chance to respond, and we therefore do not consider it. ↩
7. Whereas the average rainfall is 28 inches per year, in the 1982-1983 season 64.6 inches of rain fell. ↩
8. See Rev. Rul. 83-179, 1983-2 C.B. 43↩, for a list of counties declared disaster areas in 1983. 9. See also Solomon v. Commissioner,T.C. Memo. 1980-87 (Casualty loss for flood damage allowed only to extent of taxpayer's reasonable repair costs. No deduction allowed for decline in market value of home due to its being flood-prone, because such a decline was a nondeductible fluctuation in value that was not definite or permanent enough to prove that a loss had been suffered.); Ford v. Commissioner,T.C. Memo. 1974-101↩. 10. Respondent argues that the appraisals submitted by Mr. Peck are not credible. Even assuming that they are credible (an issue we do not reach), they do not support petitioners' claim. ↩