PAUL ABRAMS and MELBA ABRAMS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Abrams v. Commissioner
Docket Nos. 10611-76, 10612-76, 10613-76, 10614-76.
United States Tax Court
T.C. Memo 1981-231; 1981 Tax Ct. Memo LEXIS 515; 41 T.C.M. (CCH) 1459; T.C.M. (RIA) 81231; May 7, 1981. Paul Abrams, for the petitioners. Michael R. Morris, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in the Federal income tax of the petitioners: Taxable
Petitioners
Year
Deficiency
Paul and Melba Abrams
1972
$ 9,612
Gerald J. and Leona Breakstone
1972
1,419
James S. and Susan B. Kramer
1972
620
Irving S. and Muriel C. Newmark
1972
1,065
The issues are: (1) whether a medical building, owned by a partnership of which petitioners were the members, was physically damaged in 1972 as a result of a "casualty" within the meaning of section 165, Internal Revenue Code *517 of 1954, [2] and section 1.165-7(a)(1), Income Tax Regs., and (2) if the damage were caused by a "casualty," the amount, if any, of the resulting loss sustained by the petitioners in 1972. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto are incorporated herein by this reference. At the time they filed their respective petitions herein, the petitioners resided at the following locations: Petitioners
Residences
Paul and Melba Abrams
Studio City, Ca.
Gerald J. and Leona Breakstone
North Hollywood, Ca.
James S. and Susan B. Kramer
North Hollywood, Ca.
Irving S. and Muriel C. Newmark
Encino, Ca.
The petitioners filed their joint Federal income tax returns for the taxable year 1972 with the Internal Revenue Service Center, Fresno, California. Petitioners Paul Abrams, Gerald Breakstone, James Kramer, and Irving Newmark were members of a four-man investment group known as the Riverside Coldwater Investment Group (the Investment Group) which owned a medical office *518 building located at 12840 Riverside Drive, North Hollywood, California (Medical Building). The Investment Group filed a Federal partnership return for its taxable year 1972 with the Internal Revenue Service Center, Fresno, California. The construction of the Medical Building was completed in 1966.Upon completion, the building complied with applicable building codes. The building has five stories of offices with five levels of subterranean parking. An earthquake occurred on February 9, 1971, in the Sylmar-San Fernando area north of Los Angeles, California, and registered 6.5 on the Richter Scale. The Medical Building sstained no visible damage as a result of this earthquake. Petitioner Paul Abrams closely inspected the Medical Building for earthquake damage in October and again in December 1971. He found no visible sign of any damage at these times. Petitioner Irving Newark used an office in the Medical Building for his dentistry practice in 1971 and 1972. During 1971, he saw no visible sign of damage to the building. An earthquake occurred in the Sylmar-San Fernando area on January 20, 1972, and registered 3.1 on the Richter Scale. An "earthquake" is actually a series *519 of movements which occur beneath the earth's surface. It is generated by a stress failure in the subterranean rock. Between February 9, 1971 and January 20, 1972, there were 30 or 40 earthquakes in the San Fernando area which registered between three and four on the Richter scale. In the month following the February 1971 earthquake, there were many aftershocks, some registering up to 5 on the Richter scale. In the early morning of January 21, 1972, Abrams received a phone call requesting that he go to the Medical Building, which he did. When he arrived, he found that the concrete surfaces of the building were riddled with cracks. In the five subterranean levels there were long, horizontal cracks in the concrete walls, running their whole length, up to 40 feet. There were long cracks on the inside surfaces of the outer walls of the upper levels. Hairline cracks were visible in the stairwells. On the outside of the building there were diagonal cracks in the concrete panels, and at every floor level there were horizontal cracks running the length of the building. The earthquake which occurred on January 20, 1972, induced stresses upon a five-story office building located *520 in the North Hollywood area which were somewhat less than 1/10 of the stresses for which such structures would be designed under applicable building codes. The February 9, 1971, earthquake, however, induced stresses in this area which were 100 times greater than those of prior earthquakes.
Dr. George Housner is a professor of engineering at the California Institute of Technology. He holds a Ph.D. in engineering. His specialty is studying earthquakes and their effects upon man-made structures. He is a member of many professional societies and has been president of three--the Seismological Society of America, the Earthquake Engineering and Research Institute, and the International Association for Earthquake Engineering. It is Dr. Housner's opinion that it is highly unlikely that an office building in North Hollywood, constructed in 1966, would sustain structural damage as a result of the January 20, 1972, earthquake. Dr. Housner believes that it is unlikely that the earthquake of January 20, 1972, would expose structural damage caused to a small office building in North Hollywood by the February 1971 earthquake. In his opinion, damage caused to a building in the North Hollywood *521 area by the February 1971 earthquake would probably be apparent within a short time thereafter. He believes it highly unlikely that such damage would go undetected for a year. Dr. Housner does not believe that, if a building survived the strong shaking of the February 1971 earthquake, a later earthquake producing weaker shaking could cause any damage to the building. David Weiss is licensed as a structural engineer by the State of California. He has designed numerous concrete, masonry, and timber structures and has been involved in the repair of buildings damaged in the February 1971 earthquake. He has rendered opinions as to the estimated cost of these repairs in some cases. David Weiss knew of instances when buildings had been damaged in the February 1971 earthquake but the damage did not become apparent until long afterwards. Weiss would be asked to inspect various commercial structures for clients who were contemplating purchasing them to ensure that the structures had suffered no damage from the February 1971 earthquake. The client would have received reports from the owner stating that no damage had been detected after the February 1971 earthquake. However, upon inspection, *522 Weiss would discover cracks attributable to the earthquake. Mr. Weiss observed the same phenomenon in connection with his home. Prior to the February 1971 earthquake, the walls had no cracks in them. A year or two later, however, he noticed that there were cracks in the drywall joints and cracks radiating out from the corners of windows. In his opinion, the cracks were caused by the February 1971 earthquake. It is Weiss' opinion that the cracks in the Medical Building were caused by this earthquake. Robert H. Flavell is a professional real estate appraiser. He is a member of the American Institute of Real Estate Appraisers, the Society of Real Estate Appraisers, the Los Angeles Realty Board, and several other professional associations. He has taught courses in the valuation of Real Property and Advanced Real Estate Appraisal, has lectured at various universities, and has conducted various seminars for the American Institute of Real Estate Appraisers. He has been appointed by judges of the Superior Court in and for the County of Los Angeles to perform appraisals, and performs a substantial amount of appraisal work for government agencies, including departments of the State *523 of California and the County and City of Los Angeles. He occasionally prepares appraisals for financial institutions such as the Bank of America, United California Bank and the Crocker National Bank. Mr. Flavell extensively examined the cracks in the Medical Building. He requested that a structural engineer examine and render an estimate of the cost to repair the cracks. David Weiss, whose qualifications have been set out above, accordingly inspected the cracks and drew up a report which he gave to Flavell. It was his opinion as expressed in the report that the cracks should be repaired because they would allow intrusion of water which over prolonged periods of time would cause rusting or deterioration of the reinforcing steel at the basement levels, and damage to interior wall and floor coverings at the upper levels, of the building. He estimated that the cost to repair the cracks would be $ 86,074. This figure reflects 1978, rather than 1972, labor and materials costs. It is Flavell's opinion that a well-informed prospective buyer of the Medical Building would either insist that the seller repair the cracks or reduce the purchase price by the cost of repair and repair *524 it himself. Flavell believes that the market would react to the cracks and discount the value of the building by the cost of repair. In Flavell's opinion, the Medical Building was worth $ 1,200,000 before the January 20, 1972, earthquake, and $ 1,114,000 ($ 1,200,000 minus $ 86,000 cost of repairs) afterwards. There was no decrease in the occupancy level of the Medical Building due to the cracking within several months of January 20, 1972. The following table shows the actual gross and net income before debt service, depreciation, and partner's life insurance received from the operation of the Medical Building for 1969 through 1972: 1969
1970
1971
1972
Gross Income
$ 162,493
$ 175,805
$ 177,258
$ 182,766
Net Income
72,806
76,932
58,829
93,670
The petitioners did not actually repair the cracks. Several years after 1972 large amounts of water entered the Medical Building through some of the cracks. Firetrucks were required to pump the water out. Christopher Hardy at the time of trial was a valuation engineer employed by the Internal Revenue Service. He had received a B.S. degree in engineering and had taken several real estate appraisal *525 courses. By 1977, Hardy had appraised between 30 and 40 pieces of real estate. He was not a member of any professional appraisal societies although he was a candidate for membership in the American Institute of Real Estate Appraisers. Hardy inspected the Medical Building and it is his opinion that the cracks did not reflect structural damage that would physically weaken the building. He believes that in view of this fact and because there was no loss in occupancy level or rental revenues after January 20, 1972, a potential buyer would not be overly concerned about the cracks and hence that the cracks did not result in any decline in the building's value. In Hardy's opinion, the fair market value of the building both before and after the cracks appeared was $ 1,260,000. On September 14, 1971, Abrams filed an "Application for Equalization of 1971 Assessment," requesting a reevaluation of the County Assessor's determination that the Medical Building was worth $ 1,124,200 on March 1, 1971. Pursuant to Abram's appeal, the County Assessor reduced the value of the building to $ 1,100,000. None of the petitioners filed an appeal subsequent to 1971 to change the assessment. On *526 their partnership return for 1972, the petitioners deducted $ 36,400 for "earthquake damage" on account of the cracks in the Medical Building in computing the partnership loss. The Commissioner disallowed the deduction in full. Petitioners now claim not only that the Commissioner's disallowance was erroneous, but that a figure of $ 86,000 was properly deductible in computing the 1972 partnership loss. OPINION Issue I: Did the Cracks in the Medical Building Result From a Casualty? Section 165 of the Internal Revenue Code of 1954 provides: SEC. 165. LOSSES. (a) GENERAL RULE.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
(b) AMOUNT OF DEDUCTION.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) LIMITATION ON LOSSES OF INDIVIDUALS.--In the case of an individual, the deduction under subsection *527 (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * * To be allowable as a deduction under 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and actually sustained during the taxable year. Sec. 1.165-1(b), Income Tax Regs. By its term, only section 165(c)(1) applies to the petitioners, because the Medical Building is property used in the partnership's trade or business of office rental. The general rule is that before a taxpayer may claim a loss for a business asset, he must either sell the asset, or if its usefulness in the business has been destroyed and it is not sold, must permanently discard it from use in the business. A loss deduction is generally not permitted where there is a mere shrinkage in value. Rather, there *528 must be a complete elimination of all value plus a recognition by the owner that his property no longer has any utility to him by means of a specific act proving his abandonment of all interest in it. Sec. 1.167(a)-8(a), Income Tax Regs; Reporter Publishing Co. v. Commissioner, 201 F.2d 743, 744 (10th Cir. 1953), cert. denied 345 U.S. 993 (1953), affg. 18 T.C. 86 (1952); New York Sun v. Commissioner, 27 T.C. 319, 328 (1956), affd. 253 F.2d 487 (2d Cir. 1958). The abandonment or permanent retirement constitutes the "closed and completed transaction fixed by identifiable events" required as a prerequisite to deduction. It follows that a taxpayer may not normally claim a loss deduction for mere damage to an asset which he continues to use in his trade or business. Section 165 provides an exception to this rule by extending the casualty loss deduction of section 165(c)(3) to business assets. Section 1.165-7(a)(1), Income Tax Regs., provides: SEC. 1.165-7. *529 Casualty losses. (a) In general--(1) Allowance of deduction. * * * any loss arising from fire, storm, shipwreck, or other casualty is allowable as a deduction under section 165(a) for the taxable year in which the loss is sustained. * * * The manner of determining the amount of a casualty loss allowable as a deduction in computing taxable income under section 63 is the same whether the loss has been incurred in a trade or business or in any transaction entered into for profit, or whether it has been a loss of property not connected with a trade or business and not incurred in any transaction entered into for profit.The amount of a casualty loss shall be determined in accordance with paragraph (b) of this section. * * * It follows that to claim a loss for 1972, the petitioners must show that the cracks in the Medical Building "[arose] from fire, storm, shipwreck, or other casualty." There must be a causal connection between the alleged casualty and the loss claimed by the taxpayer. Kemper v. Commissioner, 30 T.C. 546, 549-50 (1958), affd. 269 F.2d 184 (8th Cir. 1959). It is the petitioners' contention that the cracks in the Medical *530 Building were caused by the January 1972 earthquake in conjunction with the earthquake of February 1971. While the evidence establishes that the earlier earthquake was quite capable of inflicting substantial structural damage to the Medical Building (it induced stresses approximately 10 times greater than those for which the building was designed), the later one was much less severe and induced stresses only 1/100 as great as the former. Respondent's expert witness, Dr. Housner, believes that it is highly unlikely that an office building in North Hollywood, constructed in 1966, would sustain any structural damage as a result of this earthquake. Petitioners advance the theory that the earlier earthquake and later aftershocks caused dislocations which produced the cracks only after the January 1972 earthquake. Dr. Housner's opinion is that this is highly unlikely and that if the earlier earthquake did cause damage, the damage would have been apparent shortly thereafter. However, he did testify as follows: THE WITNESS: * * *. Are you * * * asking me if it really happened that a building survived the strong shake and really suffered damage in the minor shake, would I believe it *531 * * *? MR. ABRAMS: Yes. A. Yes. Perhaps I would believe it, yes. Petitioners' expert witness David Weiss has had considerable experience in the repair of earthquake damage. He testified to situations he was familiar with where cracks in commercial structures would appear long after the earthquake which caused them. He observed the phenomenon in his own home. It is his opinion that the cracks in the Medical Building were caused by the February 1971 earthquake.
There is thus a sharp conflict in the expert testimony over whether the cracks were due to an earthquake. Petitioner Paul Abrams testified that there were no cracks in the Medical Building as of late December 1971, and that one day shortly after the January 1972 earthquake he observed the cracks. We considered Abrams to be a credible, competent witness. His testimony was corroborated by Petitioner Irving Newmark. Accordingly, we find that the cracks developed over a very short period of time, perhaps overnight. While we do not conclude that they were necessarily caused directly by an "earthquake," their abrupt manifestation, when added to the considerable seismic activity occurring in the San Fernando area around *532 the time they appeared, indicate that they resulted from a sudden, unexpected natural force acting upon the Medical Building. A "casualty" is "an accident, a mishap, some sudden invasion by a hostile agency; it excludes the progressive deterioration of property through a steadily operating cause." Fay v. Helvering, 120 F.2d 253 (2d Cir. 1941).It is an event or series of events which are "sudden, unexpected, violent * * * [involving] the application of considerable destructive force" to the property in question which force the taxpayer is powerless to prevent. It need not necessarily be of catastrophic proportions, however. White v. Commissioner, 48 T.C. 430, 433-34, 435 (1967); see Grant v. Commissioner, 30 B.T.A. 1028 (1934) ("casualty" includes the 40-foot subsidence of land over a one-year period); Heyn v. Commissioner, 46 T.C. 302 (1966) (an earthslide is a "casualty"). We, therefore, conclude that the cracks in the Medical Building resulted from a "casualty" in 1972. We now proceed to determine the amount of *533 loss, if any, which petitioners sustained in 1972 arising from the casualty. Issue 2: Amount of Loss
Section 1.165-7(a)(2) and (b), Income Tax Regs., provide as follows: (2) Method of valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. * * * (ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty. (b) Amount deductible. (1) @general rule. In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for *534 profit, the amount of loss to be taken into account for the purposes of section 165(a) shall be the lesser of either-- (i) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or (ii) The amount of the adjusted basis prescribed in section 1.1011-1 for determining the loss from the sale or other disposition of the property involved.
Petitioners' expert witness Robert Flavell believes that the market value of the Medical Building before the casualty was $ 1,200,000, and $ 1,114,000 after the casualty. In arriving at the latter figure, he subtracted $ 86,000, which he estimated to be the cost to repair the cracks, from the former figure. It is his opinion that the cracks lowered the value of the building by this amount because the market would respond to damage in that a well-informed prospective buyer would insist that the cracks be repaired or repair them himself. Respondent's expert witness Christopher Hardy believes that because the cracks did not reflect structural damage and because there was no reduction in rentals during 1972, the cracks did not *535 result in any reduction in fair market value. Again, we have a sharp conflict in expert testimony. As a preliminary matter, respondent contends that Flavell's method of determining loss in value was improper because no repairs were actually made to the Medical Building. Section 1.165-7(a)(2), Income Tax Regs., set out above, permits the taxpayer to use either of two methods in determining the amount of a casualty loss: (1) the decrease in fair market value resulting from the casualty as determined by competent appraisal, section 1.165-7(a)(2)(i), Income Tax Regs., or (2) the cost of repairs, section 1.165-7(a)(ii), Income Tax Regs.Farber v. Commissioner, 57 T.C. 714, 719 (1972). It is true that we have held that when a taxpayer elects to use the second alternative method of determining loss, the repairs and associated expenditures must actually be made.Mere estimates of repair costs are not a sufficiently persuasive measure of loss. Lamphere v. Commissioner, 70 T.C. 391, 396 (1978). *536 Lamphere does not apply to the case at bar, however, because the petitioners have clearly used the first, and not the second, method of determining loss. They determined fair market value before and after the appearance of the cracks by the use of Flavell's competent appraisal.We never held that an appraiser may not take into account, in arriving at an estimate of post-casualty fair market value, the probable costs of repairing the damaged property. In fact, any such holding would represent a rather questionable assertion of judicial authority, as we are not qualified experts in the field of appraising property. We, therefore, reject respondent's contention that Flavell's method was primafacie improper. There is, nevertheless, a substantial defect in the petitioners' valuation. The $ 86,000 cost of repair, as we point out in our findings of fact, is based upon 1978 rather than 1972 labor and materials costs.The cost of repair immediately post-casualty is the relevant figure.
The expert testimony and the actual water damage to the Medical Building persuades us that the cracks reduced its value at least to some extent. A buyer simply is not going to pay as much for *537 a building with water-conducting cracks in it as he or she would for the same building unblemished. Petitioners have presented no basis for the $ 36,400 loss deduction they claimed on the 1972 partnership return.They have presented a less-than-satisfactory basis for the $86,000 deduction they now claim. We do feel, however, that they sustained some loss in 1972. Using our best judgment and bearing heavily against the taxpayers whose inexactitude is of their own making, Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930), we conclude that the partnership is entitled to a casualty loss deduction of $ 55,000 [3] for 1972. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Gerald J. Breakstone and Leona Breakstone, docket No. 10612-76; James S. Kramer and Susan B. Kramer, docket No. 10613-76; Irving S. Newmark and Muriel C. Newmark, docket No. 10614-76.↩
2. All section references are to the Internal Revenue Code of 1954, as amended.↩
3. We arrived at this figure by discounting (deflating) the $ 86,000 estimated 1978 cost of repair to reflect 1972 costs, using the Consumer Price Index. While this method may not yield pinpoint precision, we feel it provides a rational basis for our determination.↩