T.C. Memo. 2016-197

UNITED STATES TAX COURT

HOWARD BRUCE COATES AND TANDI A. COATES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15258-14.                    Filed October 31, 2016.

Kenneth W. Klingenberg and Kenneth T. McConkey, for petitioners.

Jamie M. Stipek, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  The respondent in this case (the "IRS") issued a
notice of deficiency to the petitioners, Howard Bruce Coates ("Coates") and Tandi
A. Coates (collectively "the Coateses"), for the 2010 taxable year.  In this notice,
the IRS disallowed a casualty-loss deduction of $127,731 and determined a

[*2] deficiency of $32,335 and a penalty under section 6662(a) of $6,467.[1] The Coateses timely filed a petition under section 6213(a) for redetermination of the deficiency. We have jurisdiction under section 6214(a). The following issues remain unresolved:

I.      The amount of the Coateses' casualty-loss deduction, if any, for the 2010 taxable year. We hold that they are entitled to a casualty-loss deduction of $39,731.

II.     Whether the Coateses are liable for a section 6662(a) penalty for the 2010 taxable year. We hold that they are not liable.

FINDINGS OF FACT

The parties stipulated some facts, and those facts are incorporated by reference. The Coateses resided in Oklahoma when they filed the petition.[2]

In 2010, the Coateses owned a large amount of land in Seminole County, Oklahoma. One tract was 700 acres that consisted of three adjacent areas: (1) 80 acres on which they resided, referred to here as "property A", (2) 440 acres of

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the 2010 taxable year, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Therefore, an appeal of our decision in this case would go to the U.S. Court of Appeals for the Tenth Circuit, see sec. 7482(b)(1), unless the parties designate the Court of Appeals for another circuit, see id. para. (2).

[*3] undeveloped woodlands, referred to here as "property B", and (3) 180 other acres. Coates testified that he had bought property A and property B from his mother many years before. Evaluating this claim with the rest of the record, we agree with this testimony except that (1) some of the land was acquired jointly by Coates and Tandi A. Coates, (2) some of the land was acquired from Coates's father (not just Coates's mother), and (3) the record does not support the claim that the Coateses paid for the land (as opposed to having received it as a gift).[3]

Property A consisted of 80 acres. It included the Coateses' house (which was their personal residence) and two barns. The Coateses built the house in 2000. They used some of the land to farm and to graze cattle. Property A is at 36147 EW 1200, Seminole, Oklahoma 74868.

Property B, adjacent to property A, consisted of 440 acres of undeveloped woodland. Thousands of mature oak trees grew on the land. The oldest oak trees were 200-250 years old. The woodland was populated by wild turkeys, deer, wild boars, rabbits, and squirrels. The Coateses used the land recreationally to hunt, fish, and hike. They did not charge anyone for use of the land. Property B is within sections 3, 4, and 9 of Township 9 North Range 7 East. This township is in

---

[3]Whether the Coateses purchased property A and property B or received them as gifts is relevant to the adjusted bases of property A and property B, which are discussed infra part I.B. and infra part I.E., respectively.

**[\*4]** Seminole County, Oklahoma. (A township comprises 36 sections of land. A section is a square piece of land the sides of which are each one mile.)

The larger Coates family (i.e., the Coateses, Coates's parents, and Coates's siblings) owned 4,000 acres of land that they refer to as the "ranch". The ranch included the Coateses' 700 acres, of which property A and property B were a part. The Coates family had owned the ranch since at least 1932, and Coates grew up there.

On January 11, 2010, the Coateses commissioned an appraisal (the "2010 appraisal") of 120 acres that included the 80 acres of property A. The Coateses owned all 120 acres. The 2010 appraisal concluded that the fair market value of the 120 acres was $676,900.

On May 10, 2010, a tornado hit Seminole County, Oklahoma. The tornado cut through the ranch, significantly damaging property A and flattening the woodland of property B. The center of the tornado leveled a roughly mile-wide path, and the accompanying high winds uprooted trees as far as an additional half-mile on either side of the tornado's path. At trial, Coates described the damage:

> We lost--this land, the tornado just absolutely devastated it. I mean, it just pulverized it. It just mowed it down. All the big, huge oaks * * * were just * * * uprooted and left. * * * [I]t was just laid open, it was just mowed down, just literally mowed down.

**[*5]** On property A, the tornado damaged the house and barns, tore down fences, and knocked down trees. And on property B, it demolished 80%-90% of the oak trees. Without the tree canopy cover, property B became covered in dense, impassable scrub. The land no longer provided a suitable habitat for the wild turkeys, deer, and wild boars. Only the squirrels and rabbits remained after the tornado.

The Coateses had property insurance on property A. The insurance covered damage to the house and barns, but not to the land or fences. After the tornado the Coateses' insurance company, Farm Bureau Insurance, examined the house and barns and estimated the costs of repairing them at roughly $24,000-$28,000.

Because the Coateses believed that their insurance company had underestimated the costs, they hired a loss-recovery advocacy service, Crossroads Insurance Recovery Advocates, LLC ("Crossroads"), to provide an estimate of the cost to repair the house and barns on property A. The Coateses paid Crossroads roughly $20,000 for its services. Crossroads' estimate was dated May 23, 2010. Crossroads estimated that it would cost $189,247.95 to repair the house and barns on property A. The Coateses used the Crossroads estimate to negotiate with their insurance company, which ultimately compensated them $168,268 for the damage to the house and barns on property A. The Coateses reported on their tax return

[*6] that the insurance reimbursement was $148,268. This amount is the difference between the $168,268 the Coateses received from their insurance company and the $20,000 they paid to Crossroads. The Coateses used the $168,268 to repair the damage to the house and barns on property A. They also incurred other costs to repair the tornado damage to property A, such as the cost of repairing fences.

The Coateses did not insure property B and did not receive any payments for damage to it. Coates partially cleared property B of debris, seeded it with grass, and repaired some fences. He is still in the process of converting it to grazing use.

After receiving an extension of time to file, the Coateses timely filed their Form 1040, "U.S. Individual Income Tax Return", for the 2010 taxable year on September 27, 2011. They attached a Form 4684, "Casualties and Thefts", to their Form 1040, reporting a total casualty loss of $127,731 for damage to property A and property B as a result of the tornado. The computations were reported on the form as follows:

[*7]

<table>
<tr><td colspan="3"><u>Property A</u></td></tr>
<tr><td>Adjusted basis</td><td>$500,000</td><td></td></tr>
<tr><td>FMV before casualty</td><td>660,000</td><td></td></tr>
<tr><td>FMV after casualty</td><td>450,000</td><td></td></tr>
<tr><td>Lesser of (1) decline in FMV<br>  and (2) adjusted basis</td><td>210,000</td><td></td></tr>
<tr><td>Less:  insurance reimbursement</td><td>148,268</td><td></td></tr>
<tr><td>  Loss before statutory limits</td><td></td><td>$61,732</td></tr>
<tr><td colspan="3"><u>Property B</u></td></tr>
<tr><td>Adjusted basis</td><td>247,000</td><td></td></tr>
<tr><td>FMV before casualty</td><td>528,000</td><td></td></tr>
<tr><td>FMV after casualty</td><td>440,000</td><td></td></tr>
<tr><td>Lesser of (1) decline in FMV<br>  and (2) adjusted basis</td><td>88,000</td><td></td></tr>
<tr><td>Less:  insurance reimbursement</td><td>0</td><td></td></tr>
<tr><td>  Loss before statutory limits</td><td></td><td>88,000</td></tr>
<tr><td>Total loss before statutory limits</td><td></td><td>149,732</td></tr>
<tr><td>Less statutory limits:</td><td></td><td></td></tr>
<tr><td>    $100 deduction</td><td>100</td><td></td></tr>
<tr><td>    10% of AGI</td><td>21,901</td><td>22,001</td></tr>
<tr><td>  Casualty loss after statutory limits</td><td></td><td>127,731</td></tr>
</table>

The IRS examined the Coateses' 2010 tax return and questioned the casualty-loss deduction for the tornado damage.  In December 2013, the Coateses commissioned an appraisal of property B (the "2013 appraisal").  The exact boundaries of the appraised land are unclear.  This uncertainty is conveyed by the following statement in the appraisal:

**[*8]**   I [the appraiser] have assumed that a statement made by Mr. Coates that there are 440 acres with damage is correct even though the legals do not match exactly.

And by the following note in the appraisal:

> The legal descriptions of the tracts affected by the tornado do not completely correspond to the areas that are affected. Furthermore, the legals that the County Assessor is using also do not correspond exactly. For purposes of this report, I have assumed that there are actually 440 acres that have been damaged, (the legals would appear to indicate that there may be as much as 20 acres more.)

The 2013 appraisal concluded that the best use of property B was as hunting land. It concluded that the fair market value of property B--assuming that the tornado damage were fully remediated and property B were returned to its pre-tornado condition as hunting land--was $506,000 as of December 15, 2013. The 2013 appraisal estimated that it would cost $149,700 to return property B to its pre-tornado condition. See infra part I.D.

The IRS issued a notice of deficiency to the Coateses for the 2010 taxable year. The IRS disallowed the Coateses' claimed casualty-loss deduction of $127,731 and determined an income-tax deficiency of $32,335 and an accuracy-related penalty under section 6662(a) of $6,467.

The Coateses timely filed a petition for redetermination. This Court tried the case.

[*9]                          OPINION

I.    Section 165(a) deduction

As a general rule, section 165(a) allows a deduction for any loss sustained

during the taxable year and not compensated for by insurance or otherwise.  For

taxpayers who are individuals, section 165(c)(3) limits deductions under section

165(a) to three categories of losses:  (1) losses incurred in a trade or business,

(2) losses incurred in any transaction entered into for profit but not connected with

a trade or business, and (3) losses of property (a) not connected with a trade or

business or a transaction entered into for profit and (b) arising from fire, storm,

shipwreck, or other casualty, or from theft.  These three categories of losses are

provided for in section 165(c)(1) and (2) and (3), respectively.  For a loss in the

third category (i.e., section 165(c)(3)), the loss is allowed as a deduction only to

the extent that the amount of the loss exceeds $100 and then only to the extent that

the aggregate amount of such losses exceeds 10% of the taxpayer's adjusted gross

income.  Sec. 165(h)(1) and (2)(A).

The losses described in section 165(c)(3) are subdivided into two

categories:  (1) casualty losses, which are losses arising from fire, storm,

shipwreck, or other casualty, and (2) theft losses, which are losses arising from

theft.  See sec. 1.165-7, Income Tax Regs. (imposing rules for deduction of

[*10] casualty losses); sec. 1.165-8, Income Tax Regs. (imposing rules for deduction of theft losses).  The physical damage to property caused by a tornado is a casualty loss within the meaning of section 165(c)(3).  See, e.g., Howard v. Commissioner, T.C. Memo. 1969-277.  Thus, the loss to property A and property B caused by the tornado is a casualty loss.

The amount of a casualty loss is the difference between the fair market value of the property before the casualty and the fair market value of the property after the casualty.  Sec. 1.165-7(a)(2)(i), Income Tax Regs.  As a general rule, the precasualty and postcasualty values must be determined "by competent appraisal." Id.  However, the difference in the values can also be "evidenced" by "[t]he cost of repairs to the property".  Id. subdiv. (ii).  For this purpose, the cost of repairing the property must be the actual cost incurred to repair the property, not an estimate. Lamphere v. Commissioner, 70 T.C. 391, 396 (1978).  Thus, an estimate of the cost of repairing the property cannot be used to determine the decline in the value of the property.  Id.  There is one exception:  If the best use of the property after the casualty would require the repair of the property, then the decline in value can be inferred from an estimate of the cost of repairing the property.[4]

---

[4]For example, in Abrams v. Commissioner, T.C. Memo. 1981-231, 41 T.C.M. (CCH) 1459, 1464 (1981), an office building was damaged by seismic

(continued...)

[*11] The amount of a casualty loss cannot exceed the adjusted basis of the property for determining the loss from the sale or other disposition of the property. Sec. 165(a); sec. 1.165-7(b)(1), Income Tax Regs.  Thus, if the decline in value exceeds the adjusted basis for determining the loss from the sale or other disposition of property, then the amount of the loss computed under section 165(a) is limited to the adjusted basis.  Sec. 1.165-7(b)(1), Income Tax Regs.

The next step in determining the amount of a casualty loss is to reduce the amount of the loss by the compensation received on account of the loss.  Sec. 165(a); sec. 1.165-7(b), Examples (1), (2), and (3), Income Tax Regs.  The reduction is required for all of the types of losses described by section 165(a), including section 165(c)(3) casualty losses.  Finally, adjustments must be made to account for the $100 floor and the 10%-of-adjusted-gross-income floor.  Sec. 165(h)(1) and (2)(A).  These adjustments must be made for any section 165(c)(3) losses, including casualty losses.

---

[4](...continued)
events.  The owners of the building were willing to leave the damage unrepaired. Id.  However, an expert witness testified that any prospective buyer of the building would repair the damage (or insist that the seller repair the damage before the sale).  Id.  Persuaded that the expert was correct, the Court determined that the decline in value of the building was equal to the estimated cost of repairing the seismic damage.  Id. at 1465.

[*12] Given the legal tests set forth above, the following issues are relevant to the Coateses' section 165(a) deduction for the casualty losses attributable to property A and property B:

| Issue | Court's holding | Part of the opinion in which discussed |
|---|---|---|
| The decline in the value of property A | $210,000 | I.A. |
| The adjusted basis of property A | At least $210,000 | I.B. |
| The compensation the Coateses received for the tornado damage to property A | $148,268 | I.C. |
| The decline in the value of property B | At least $88,000 | I.D. |
| The adjusted basis of property B | $0 | I.E. |
| The compensation the Coateses received for the tornado damage to property B | $0 | I.F. |

We address these issues infra parts I.A., I.B., I.C., I.D., I.E., and I.F., respectively.

A.    The decline in the value of property A

The evidence establishes the following facts relevant to the decline in the value of property A:

- Property A is 80 acres of land upon which there are three structures: two barns and a house.  The Coateses built the house in 2000.

- On January 11, 2010, an appraisal was made of 120 acres (that included the 80 acres of property A).  The appraisal states that the value of the 120 acres was $676,900.

- 13 -

[*13]  ● On May 10, 2010, the tornado damaged property A.  It damaged all the structures, tore down fences, and knocked down trees.

● The Coateses had property insurance coverage on the structures on property A, but did not have coverage on the land.

● Their insurance company estimated that the cost of repairing the structures on property A was $24,000-$28,000.

● On May 23, 2010, Crossroads estimated that it would cost $189,247.95 to repair the structures on property A.  For this estimate the Coateses paid Crossroads a fee of $20,000.

● The Coateses' insurance company paid them $168,268 for the damage to the structures on property A.

● The Coateses used the $168,268 to repair the structures on property A.

● The Coateses incurred an unspecified amount of other costs to repair the tornado damage to property A, such as to repair fences.

● The Coateses reported on their 2010 return that the value of property A before the tornado was $660,000 and that the value of property A after the tornado was $450,000, a difference of $210,000.  Coates testified that these two values corresponded to his view of the values of property A before and after the tornado.

In certain instances, the decline in the value of property can be inferred from the actual cost of repairing it.  Sec. 1.165-7(a)(2)(ii), Income Tax Regs.  However, the record does not reveal the amount that the Coateses expended to remediate the tornado damage to property A.  They spent the entire amount they received from the insurance company to repair the house and barns on property A.  But the other

**[*14]** amounts they spent, such as amounts spent to repair fences, are not in evidence. Furthermore, neither party suggests that the actual cost of repairs proves the decline in value of property A. Therefore, we do not consider the actual cost of repairs in determining the decline in value of property A. Instead, we determine the decline in value by following the general rule for casualty losses. This means that we calculate the value of property A before the tornado and subtract the value of property A after the tornado. See id. subdiv. (i).

The Coateses urge us to accept Coates's calculation that the pre-tornado and post-tornado values are $660,000 and $450,000, respectively. These amounts were reported on the Coateses' return. Coates explained his reasoning for these valuations in his testimony.

The IRS argues that Coates's views of the pre-tornado and post-tornado values should be accorded little weight because it contends his views are self-interested. See Shea v. Commissioner, 112 T.C. 183, 189 (1999) (stating that we are not bound to accept at face value the testimony of a landowner of the value of property if it appears to be improbable, unreasonable, or offered solely to serve the self-interests of the taxpayer). The IRS also points out that Coates is not a certified appraiser and that he did not exhaustively explain his method for determining the values.

**[\*15]** As the IRS recognizes, it is permissible for the Court to consider the opinion of the landowner as to the value of land. Harmon v. Commissioner, 13 T.C. 373, 385 (1949). The owner has unique knowledge of the land. Id. Although the relevant fair market values before and after a casualty must generally be ascertained by a competent appraisal, sec. 1.165-7(a)(2)(i), Income Tax Regs., this does not mean that the appraisal must be done by a professional appraiser. It is therefore permissible for the before-and-after values in a casualty-loss situation to be determined by a court on the basis of the landowner's opinion of these values.[5]

Here we give Coates's views special weight. He owned property A before and after the tornado. Furthermore, he has substantial experience working with timberland, farmland, and pastureland. For 30 years, Coates has been handling various tasks on the ranch. Coates has also bought and sold various properties in Seminole County. Some of the land Coates bought had been damaged by fire or was overgrown. In those instances, he had to restore the land to workable farmland or grazing land before reselling it. In our view, Coates was credible and knowledgeable about the before-and-after values of property A.

---

[5]Two examples of opinions in which the Court has done so are Corby v. Commissioner, T.C. Memo. 1980-96, and Guilbeau v. Commissioner, T.C. Memo. 1980-166.

[*16] One might posit that Coates' pre-tornado valuation of the 80 acres of property A as $660,000 is inconsistent with the 2010 appraisal, which was done by a professional appraiser.  The professional appraiser opined that the 120 acres, including the 80 acres of property A, was worth $676,900.  The 40 acres valued by the professional appraiser but not valued by Coates would surely be worth more than the $16,900 difference between the professional appraisal and Coates's valuation.  Yet the apparent inconsistency does not shake our view that Coates's valuations are reasonable.  The valuation of a property often does not yield a single correct answer.  There are often disagreements about property value, even among qualified appraisers motivated by good faith.

We agree with Coates that the value of property A before the tornado was $660,000 and its value after the tornado was $450,000.  This is a decline in value of $210,000.[6]

The $210,000 decline in value is not inconsistent with the other facts about property A in the record.  For example, it is not inconsistent with the fact that the Coateses' insurance company paid them only $168,000 for the damage to property

---

[6]The Coateses conceded that they have the burden of proof regarding the decline in value of property A.  Our finding that the decline in value is $210,000, as they assert, is supported by the preponderance of the evidence.  They have satisfied the burden of proof.

**[*17]** A. The insurance company was required to pay only for damage to the

house and barns on property A. It was not required to pay for damage to the land,

trees, and fences. Thus, its $168,000 payment did not pay for the damage to the

land, trees, and fences.

  B.  The adjusted basis of property A

 We consider the following facts and events regarding the adjusted basis of

property A:

- On their 2010 tax return, the Coateses reported a casualty loss to property A of $61,732 and to property B of $88,000. After these amounts were adjusted for the $100 floor and the 10%-of-adjusted-gross-income floor, the total casualty loss deduction they claimed was $127,731. The Coateses reported that their adjusted basis in property A was $500,000 and that their adjusted basis in property B was $247,000.

- In the notice of deficiency, the IRS disallowed the $127,731 amount that the Coateses had deducted as a casualty loss under section 165(a). The notice explained:

  > It is determined that you are not entitled to a casualty loss for taxable year 2010 because your loss has been disallowed to the extent that reimbursements were received from your insurance company. In addition your loss is limited to the lesser of cost or fair market value at the time of loss. For each casualty and theft loss, you must reduce that loss by $100 and by ten (10) percent of your adjusted gross income. Accordingly, taxable income is increased $127,731.00 for tax year ended December 31, 2010.

[*18] ● A week before trial, IRS counsel explained to the Coateses that the IRS challenged their adjusted bases in property A and property B.

● At trial, IRS counsel explained that the IRS challenged the Coateses' adjusted bases in both property A and property B.

● In its opening brief filed after trial, the IRS contended that "[p]etitioners have failed to establish their adjusted basis in property B." However, the IRS did not make a similar contention with respect to property A.

The amount of a casualty loss cannot exceed the taxpayers' adjusted basis in the damaged property. Sec. 1.165-7(b)(1), Income Tax Regs. The Coateses reported that their adjusted basis in property A was $500,000. This exceeds $210,000, the amount that we found to be the loss to property A. Although the IRS initially challenged the Coateses' adjusted basis in property A, the IRS's posttrial brief does not make such a challenge.[7] The brief does challenge the Coateses' calculation of their adjusted basis in property B. In our view, the IRS has waived the issue of the Coateses' adjusted basis in property A. See Rule 151; Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001). For the full $210,000

---

[7]Although we do not know why the IRS chose not to pursue its challenge to the Coateses' adjusted basis in property A in its brief, we observe that there was evidence at trial that it cost the Coateses $600,000 to build the house on property A. This would have increased the Coateses' adjusted basis in property A by $600,000. See sec. 1016(a)(1) (providing that proper adjustment in respect of property must be made for expenditure properly chargeable to capital account); sec. 1.263(a)(1)-1, Income Tax Regs. (providing that no deduction allowed for amount paid for new buildings).

**[\*19]** decline in value to be considered a casualty loss, the Coateses' adjusted basis in property A must be at least $210,000.[8] We hold that the Coateses' adjusted basis in property A is at least $210,000.

C.  The compensation the Coateses received for the tornado damage to property A

As explained above, the amount of a loss under section 165(a) must be reduced by the compensation received. The Coateses paid $20,000 to Crossroads for its estimate of the damage to property A. The Coateses received $168,268 from their insurance company for property A. On their 2010 tax return, the Coateses reported that they received insurance payments totaling $148,268 from losses attributable to property A resulting from the tornado. The parties stipulated: "Petitioners received insurance reimbursements totaling $148,268 for wind damage to Property A." In its posttrial briefs, the IRS argued that the amount of compensation should be considered to be $168,268, unreduced by the $20,000 payment to Crossroads. However, the IRS failed to argue that this Court should set aside the stipulation that the total insurance reimbursements were $148,268. This stipulation suggests that the $168,268 received by the Coateses from the

---

[8]If property A and property B were considered a single property, then we should compare the adjusted bases for the combined property to the loss attributable to the combined property. However, the Coateses do not argue that property A and property B should be considered one property.

[*20] insurance company should be reduced by their $20,000 payment to Crossroads. Stipulations are binding unless otherwise permitted by the Court. Rule 91(e). The IRS did not request that the Court relieve it of the stipulation. Therefore, we need not determine on the merits whether the amount of compensation received by the Coateses was $168,268 (the amount received from the insurance company without reduction for their $20,000 payment to Crossroads) or $148,268 (the $168,268 minus the $20,000). The stipulation means that the amount of reimbursement should be computed as the net amount, $148,268. Accordingly, we hold that the Coateses received compensation of $148,268 for their loss. Thus, the total casualty loss attributable to property A before statutory limitations is $61,732. In summary:

| Property A | | |
|---|---|---|
| Adjusted basis | $210,000 | |
| FMV before casualty | 660,000 | |
| FMV after casualty | 450,000 | |
| Lesser of (a) decline in FMV and (b) adjusted basis | 210,000 | |
| Less: Insurance reimbursement | 148,268 | |
| Loss before statutory limits | | $61,732 |

D.    The decline in value of property B

The evidence establishes the following facts relevant to the decline in the value of property B:

[*21]  ● Property B consisted of 440 acres of undeveloped woodland before the tornado.

● Before the tornado, property B was covered with mature trees. It was populated by wild turkeys, deer, wild boars, rabbits, and squirrels. It was used by the Coateses recreationally, including for hunting. They charged no fees for the use of the land. Because its tree cover prevented grass from growing, property B could not be used as grazing land before the tornado.

● The tornado of May 10, 2010, demolished much of the tree cover. Exposed to the sun, the ground became overrun by dense scrub unsuitable for wild turkeys, deer, and wild boars.

● After the tornado, Coates made some efforts to convert the land for use as grazing land. He partially cleared the land. He seeded it with grass. He also built fences. He has not yet finished converting the land for grazing use. The amount spent so far is not in evidence.

● On their 2010 tax return, the Coateses reported that the fair market value of property B before the tornado was $528,000 and the fair market value of property B after the tornado was $440,000. The difference, $88,000, is equal to $200 multiplied by 440 acres. The $200 amount was Coates's conservative estimate of the cost of clearing an acre of property B so that it could be used for grazing.

● Coates testified that the $528,000 pre-tornado valuation of property B reported on the Coateses' 2010 return was his view of the value of property B before the tornado. He explained that similar properties in the area sold for $1,200 to $1,500 per acre.

● Coates testified that $200 per acre was a conservative estimate of the cost of clearing property B for grazing use. He testified that a more realistic estimate might be $500 per acre because of the tediousness and dangerousness of the work. At $500 per acre, it would cost $220,000 to clear property B such that it could be used for grazing. Coates further testified that the most economical use of property B is

[*22]     to turn it into grazing land. He explained that he had not yet been able to convert it to grazing land because of lack of "money and time".

- In 2013, the Coateses obtained an appraisal of property B. The 2013 appraisal stated that the land would be most valuable as hunting land, that it would cost $149,700 to restore the land to hunting use, and that after the land was restored to hunting use its value would be $506,000.

- The 2013 appraisal indicates that the appraiser was uncertain about the boundaries of property B.

Although Coates partially cleared property B and seeded it with grass, the actual cost of clearing and reseeding property B is not in the record. Furthermore, neither the Coateses nor the IRS takes the position that Coates's actual costs should be used to directly determine the decline in value of property B. See sec. 1.165-7(a)(2)(ii), Income Tax Regs.

Instead we determine the decline in value of property B by computing the value of property B before the tornado minus the value of property B after the tornado. See id. subdiv. (i). As for the value of property B before the tornado, the IRS argues that we should accord little weight to Coates's view because he is not a licensed real estate appraiser and because his testimony about the value of property B is self-serving. Coates testified that the value of property B before the tornado was $528,000, the pre-tornado value reported on the return. We found his

[*23] testimony reliable. He has substantial experience buying and selling property in Seminole County. He has special knowledge of property B as its owner. We find that the value of property B before the tornado was $528,000.

As for the value of property B after the tornado, we find that the evidence supports Coates's claim that the value was $440,000. First, Coates testified that the best use of property B after the tornado was to convert it to grazing land. His views are credible because he is experienced in converting land from one use to another to make it more valuable. Furthermore, he has already partially converted property B to grazing land, thus proving by expenditure of his own money the genuineness of his view that property B is most valuable as grazing land.

Because we find that the best use of property B after the tornado is as grazing land, our next task is to determine its value. If land is most valuable in a use other than its current use, its value equals what its value would be after it was converted to the new use minus the estimated cost of converting it. See, e.g., United States v. 33.90 Acres of Land, 709 F.2d 1012, 1015 (5th Cir. 1983); United States v. 125.70 Acres of Land, 667 F.2d 243, 249 (1st Cir. 1981); Hickey v. United States, 208 F.2d 269, 277 n.7 (3d Cir. 1953); Estate of Kahn v. Commissioner, 125 T.C. 227, 240 (2005). Thus, the value of property B should be

[*24] equal to (1) its value after it has been converted to grazing land minus (2) the cost of converting it to grazing land.

As for the value of property B as grazing land, Coates testified convincingly that property B was more valuable as timberland than as grazing land. We have already found property B's value as timberland. Property B was timberland before the tornado, and we found that property B's pre-tornado value was $528,000. Because property B's value as timberland was $528,000, and because its value as grazing land is less than its value as timberland, it follows that its value as grazing land is less than $528,000.

As to the cost of converting property B to grazing land, we were convinced by Coates's explanation of how expensive and tedious it would be to convert tornado-damaged land to grazing land. As a result we believe that the cost would be at least $88,000, the amount Coates assumed when he reported the post-tornado value on his return.

Thus far, the following propositions relevant to the value of property B after the tornado have been established:

(1) The value of property B after the tornado is equal to the value of property B as grazing land minus the cost of converting tornado-damaged property B to grazing land.

**[\*25]** (2)  The value of property B as grazing land is less than $528,000.

(3)  The cost of converting tornado-damaged property B to grazing land is $88,000 or more.

From these three propositions, it follows that the value of property B after the tornado is $440,000 or less.[9]  It is the Coateses' litigating position that the value is $440,000.  They do not contend that the post-tornado value of property B is less than $440,000.  The post-tornado value of the land would be less than $440,000 if either (a) its value as grazing land is less than $528,000 or (b) the cost of converting property B to grazing land is more than $88,000.  But because the Coateses do not argue for a post-tornado value below $440,000, we need not

---

[9]Let $V_t$ be the value of the land after the tornado.  Let $V_g$ be the value of the land after conversion to grazing land.  Let C be the cost of converting the land from tornado-damaged land to grazing land.  The three propositions can be expressed as:

(1)  $V_t = V_g - C$
(2)  $V_g < 528,000$
(3)  $C \geq 88,000$

Rearranging the first proposition ($V_t = V_g - C$) yields $V_g = V_t + C$.
Combining this with the second proposition ($V_g < 528,000$), it follows that $V_t + C \leq 528,000$.
This equation becomes $528,000 - V_t > C$.  Combining this equation with the third proposition ($C \geq 88,000$), it follows that:

$528,000 - V_t > C \geq 88,000$.
And
$528,000 - V_t \geq 88,000$.
Rearranged, this equation is $440,000 \geq V_t$.

So the value of property B after the tornado is $440,000 or less.

**[*26]** consider whether the value of property B is less than $440,000. We are

satisfied that the Coateses have proven their claim that the value is $440,000.[10]

_____

[10]The Coateses concede that they have the burden of proof regarding the decline in value of property B. Our finding that the decline in value is $220,000, as they assert, is supported by the preponderance of the evidence. They have therefore satisfied the burden of proof.

We have not relied on the 2013 appraisal to determine the value of property B after the tornado. The 2013 appraisal stated that property B would be most valuable as hunting land, that its value would be $506,000 as hunting land, and that the cost of restoring the land to hunting use would be $149,700. This would suggest that the post-tornado value of property B would be $506,000 (the value after converting the tornado-damaged property B to hunting land) minus $149,700 (the estimated cost of the conversion), or $356,300. However, the Coateses did not obtain an appraisal of property B until 2013, after the examination of their 2010 tax return began, and more than 3-1/2 years after the May 10, 2010 tornado. It is questionable that the 2013 appraisal was timely under the applicable regulation, which provides that "the fair market value of the property immediately before and <u>immediately after</u> the casualty shall generally be ascertained by competent appraisal." Sec. 1.165-7(a)(2), Income Tax Regs. (emphasis added). As a practical matter, property B could have been further damaged by windstorms after the tornado. Any damage from these post-tornado events could have affected the 2013 appraisal's estimate of the cost of reclaiming the property for hunting use. In particular, such damage would result in an overestimate of the cost of remedying the tornado damage. Thus, even if the 2013 appraisal could satisfy the timeliness requirement in the regulation (i.e., the "immediately after" requirement), we would accord the appraisal no weight. Additionally, even if the 2013 appraisal had been conducted soon enough after the tornado, it would not be a competent appraisal within the meaning of sec. 1.165-7(a)(2)(i), Income Tax Regs., because it is not clear whether the appraised property includes only property B, as opposed to other portions of the 4,000-acre ranch. The preparer of the appraisal, David Barger, included in the appraisal this statement: "I have assumed that a statement made by Mr. Coates that there are 440 acres with damage is correct even though the legals do not match exactly". He also wrote: "The legal descriptions of the tracts affected by the tornado do not completely correspond to

(continued...)

[*27] E.     The adjusted basis of property B

The relevant facts regarding the adjusted basis of property B are the

following:

- Property B consists of 440 acres, owned by the Coateses, that are within three sections of land in Seminole County, Oklahoma. (A section is a square piece of land, one mile on each side, and consists of 640 acres.)

- The Coateses acquired property B from Coates's parents.

- Coates testified that he bought property B, but the record does not contain any proof of the amount, if any, that he paid.

- On their 2010 tax return, the Coateses reported a casualty loss to property A of $61,732 and to property B of $88,000. After these amounts were adjusted for the $100 floor and the 10%-of-adjusted-gross-income floor, the total casualty loss deduction they claimed was $127,731. The Coateses reported that their adjusted basis in property A was $500,000 and that their adjusted basis in property B was $247,000.

---

[10](...continued)
the areas that are affected. Furthermore, the legals that the County Assessor is using also do not correspond exactly". Furthermore the appraisal indicates that the land it valued was owned by someone other than the Coateses (i.e., people other than the petitioners, Howard Bruce Coates and Tandi A. Coates). For example, the appraisal lists the owners of record as (1) Brian Coates, (2) Cuba Coates (Coates's mother), and (3) and "et al."--meaning other unnamed owners. Attached to the appraisal are Seminole County Assessor records regarding the land appraised. The owners listed on these records include: (1) Harry E. Coates, (2) Coates's mother, (3) Brian P. Coates Properties, LLC, (4) Brian Coates, (5) Rhonda Coates, (6) and the Coateses. It is impossible on this record to determine whether the property appraised in the 2013 appraisal was, in fact, property B.

[*28] • In the notice of deficiency, the IRS disallowed the amount that the Coateses had deducted as a loss under section 165(a). The notice explained:

> It is determined that you are not entitled to a casualty loss for taxable year 2010 because your loss has been disallowed to the extent that reimbursements were received from your insurance company. In addition your loss is limited to the lesser of cost or fair market value at the time of loss. For each casualty and theft loss, you must reduce that loss by $100 and by ten (10) percent of your adjusted gross income. Accordingly, taxable income is increased $127,731.00 for tax year ended December 31, 2010.

• A week before trial, IRS counsel explained to the Coateses that the IRS challenged their adjusted bases in property A and property B.

• At trial, IRS counsel explained that the IRS challenged their bases in property A and property B.

• In its opening brief filed after trial the IRS contended that "[p]etitioners have * * * failed to establish their adjusted basis in property B."

A casualty-loss deduction is calculated as the difference between the fair market value of the property immediately before and after the casualty, not to exceed the adjusted basis for determining a loss from the sale or other disposition of the property. Sec. 1.165-7(b)(1), Income Tax Regs. The IRS contends that the Coateses have failed to establish their adjusted basis in property B.

**[*29]** The Coateses contend that they do not have the burden of proof with respect to their adjusted basis in property B. Rule 142(a) sets forth the rule for determining which party has the burden of proof. It states: "The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer, it shall be upon the respondent." The Coateses contend that the issue of their adjusted basis in property B is a "new matter" because it was not determined in the notice of deficiency. We disagree. The IRS's explanation of the adjustment in the notice of deficiency states that the Coateses' loss is "limited to the lesser of cost [i.e., adjusted basis] or fair market value at the time of the loss." Therefore we conclude that the Coateses have the burden of proving their adjusted basis in property B.[11]

Adjusted basis in property is equal to the basis of the property, plus or minus the adjustments required by section 1016. See sec. 1011(a). One type of

---

[11]Sec. 7491 imposes the burden of proof on the IRS for a fact if certain requirements are met. See sec. 7491(a)(1) (requiring taxpayer to introduce credible evidence), (2)(A) (requiring taxpayer to substantiate), (B) (requiring taxpayer to maintain records). The Coateses do not contend, nor does the evidence show, that these requirements have been met.

[*30] adjustment is to increase the basis by the cost incurred to develop the property.  See sec. 1016(a); sec. 1.263(a)-1(d)(2), Income Tax Regs.

The rule for determining the basis of property (before adjustments to basis) depends on how the property was acquired, whether (1) by purchase, (2) by gift, or (3) by a combined gift and purchase whereby the buyer paid less than the value of the property.  If the property was acquired by purchase, the basis is cost.  Sec. 1011(a).  If the property was acquired by gift, the basis is the donor's basis, except that if the donor's basis is greater than the fair market value of the property at the time of the gift, then for determining loss the basis is the fair market value.  Sec. 1015(a).  Section 1.1015-4, Income Tax Regs., governs sales in which the buyer pays less than fair market value for the property.  Malone v. United States, 326 F. Supp. 106, 113-114 (N.D. Miss. 1971), aff'd, 455 F.2d 502 (5th Cir. 1972).  Under this regulation, the basis for the transferee is the sum of (1) the greater of (a) the amount paid by the transferee for the property or (b) the transferor's adjusted basis in the property at the time of the transfer, and (2) the amount of increase, if any, in basis authorized by section 1015(d) for gift tax paid.  Sec. 1.1015-4, Income Tax Regs.

The record is unclear as to how the Coateses acquired property B.  Coates testified that he bought property B from his mother.  However, he did not say how

**[\*31]** much he paid his mother or when the transaction took place. The IRS argues that Coates acquired property B by gift.

In an effort to establish their basis in property B, the Coateses introduced deeds to various properties. Apparently, the Coateses contend that at least some of the deeds correspond to land in property B. However, the deeds, which reflect the transfer of land in Seminole County to Coates or to the Coateses jointly, do not state the purchase prices. And most of the deeds contain one of two notations, either "No documentary stamps required pursuant to 68 O.S.A., section 3202" or "no stamps required family transaction". The State of Oklahoma imposes a 1.5% tax on each deed or other document by which any real property is sold. Okla. Stat. Ann. tit. 68, sec. 3201(A) (West 2001). Each document subject to the tax must bear a stamp showing the tax was paid. Id. sec. 3203(B). However, Okla. Stat. Ann. tit. 68, sec. 3202 (West 2001) provides that certain types of documents are exempt from the State tax, including "[d]eeds between * * * parent and child * * * without actual consideration therefor". Id. sec. 3202(4). Thus, the notations on the deeds suggest that the deeded land was transferred by gift. We conclude that the Coateses have failed to prove what they paid for property B, if they paid anything. Thus, it is impossible to determine what rule should be used to determine the Coateses' basis in property B. And even if we knew how much the

**[\*32]** Coateses paid for property B, and therefore knew which rule should be used to compute their basis in property B, the record does not contain the necessary information to determine basis. If property B was acquired by purchase, we would need to know how much the Coateses paid for property B. See sec. 1011(a). If property B was acquired by gift, we would need to know (1) the donor's basis and (2) the fair market value of property B at the time of the gift. See sec. 1.1015-4, Income Tax Regs. If property B was acquired through a combined gift and purchase, we would need to know (1) how much the Coateses paid for property B, (2) the transferor's adjusted basis for the property at the time of transfer, and (3) the amount of increase in basis authorized by section 1015(d) for gift tax paid. See id. The record contains none of this information. Thus, the Coateses have not proven their basis in property B.

Likewise, they have not proven any positive adjustments to their basis in property B, for example, any costs incurred to improve the property. The taxpayer bears the burden of proving such costs. See Chandler v. Commissioner, 142 T.C. 279, 291 (2014). A court may estimate the cost (and the corresponding basis adjustment) but only if the taxpayer offers credible evidence that provides a factual ground for the estimate. Id.; see also Vanicek v. Commissioner, 85 T.C.

[*33] 731, 742-743 (1985). There are insufficient factual grounds for us to estimate what the Coateses paid to improve property B.

The Coateses argue that they established their adjusted basis in property B simply by reporting it on Form 4684 of their 2010 tax return. They reported that they had an adjusted basis of $247,000 in property B. However, a tax return is merely a statement of a taxpayer's claim; items reported on the return are not presumed to be correct. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979). Therefore, we are not bound by the information reported on their return.

The Coateses did not satisfy their burden of proving their adjusted basis in property B. Therefore, they are not entitled to a casualty-loss deduction with respect to the tornado damage to property B. See Zmuda v. Commissioner, 79 T.C. 714, 727-728 (1982), aff'd, 731 F.2d 1417 (9th Cir. 1984); Millsap v. Commissioner, 46 T.C. 751, 760 (1966), aff'd, 387 F.2d 420 (8th Cir. 1968); Towers v. Commissioner, 24 T.C. 199, 239 (1955), aff'd, 247 F.2d 233 (2d Cir. 1957); Heckett v. Commissioner, 8 T.C. 841, 847 (1947).

F.   The compensation the Coateses received for the tornado damage to property B

The IRS does not contend that the Coateses received compensation for the tornado damage to property B.

[*34] The total casualty loss to property B is zero. In summary:

Property A

| | | |
|---|---|---|
| Adjusted basis | $210,000 | |
| FMV before casualty | 660,000 | |
| FMV after casualty | 450,000 | |
| Lesser of (a) decline in FMV and (b) adjusted basis | 210,000 | |
| Less: insurance reimbursement | 148,268 | |
| Loss before statutory limits | | 61,732 |

Property B

| | | |
|---|---|---|
| Adjusted basis | 0 | |
| FMV before casualty | 528,000 | |
| FMV after casualty | 440,000 | |
| Lesser of (a) decline in FMV and (b) adjusted basis | 0 | |
| Less: insurance reimbursement | 0 | |
| Loss before statutory limits | | 0 |
| | | |
| Total loss before statutory limits | | 61,732 |
| Less statutory limits: | | |
| $100 deduction | 100 | |
| 10% of AGI | 21,901 | 22,001 |
| Casualty loss after statutory limits | | 39,731 |

II.    Accuracy-related penalty

The IRS determined an accuracy-related penalty under section 6662(a). The Coateses deny that they are liable for the penalty and maintain that they had reasonable cause and acted in good faith in preparing their 2010 tax return.

Section 6662(a) imposes a 20% penalty on an underpayment of tax attributable to any of the causes listed in subsection (b). These causes include "(1)

**[\*35]** Negligence or disregard of rules or regulations" and "(2) Any substantial understatement of income tax." A substantial understatement of income tax is defined as any understatement exceeding the greater of "(i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000." Sec. 6662(d)(1).

With respect to any penalty, section 7491(c) imposes the burden of production on the IRS. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). This requires the IRS to come forward with evidence indicating that it is appropriate to impose the relevant penalty. Sec. 7491(c); Higbee v. Commissioner, 116 T.C. at 446. Once the IRS has met this burden, the taxpayer bears the burden of proving that the penalty is inappropriate because, for example, the taxpayer acted with reasonable cause and in good faith. Higbee v. Commissioner, 116 T.C. at 447. The penalty under section 6662(a) is not imposed, with respect to any portion of an underpayment, on a taxpayer who (1) had reasonable cause for that portion and (2) acted in good faith with respect to that portion. Sec. 6664(c)(1). The regulations provide that reasonable cause and good faith are determined on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

**[\*36]** In the notice of deficiency the IRS determined that the Coateses were liable for an accuracy-related penalty under section 6662(a) of $6,467 for 2010. The IRS contends that the Coateses' underpayment of tax is attributable to either negligence or, alternatively, a substantial understatement of income tax. The Coateses assert a defense to the section 6662(a) penalty based on reasonable cause and good faith.

Coates arrived at the valuations he reported using his expertise, and the valuations reflected his honest opinion of his losses. For the year at issue, we find that the Coateses did not act negligently. The Coateses prepared their 2010 tax return in good faith and had reasonable cause for claiming an excessive casualty-loss deduction. The Coateses are not liable for the section 6662(a) accuracy-related penalty for the 2010 taxable year.

We leave the parties to make computations under Rule 155 in accordance with the above holdings.

**[*37]** In reaching our holdings, we considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.